Roger **MULLER,** Plaintiff,

v.

The **HOTSY CORPORATION,** Defendant.

No. C 94–3040.

United States District Court,
N.D. Iowa,
Central Division.

Feb. 21, 1996.

Blake Parker, Parker Law Office, Fort Dodge, Iowa, for Roger Muller.

Neven J. Mulholland, Johnson, Erb, Bice, Kramer, Good & Mulholland, Fort Dodge, Iowa, for The Hotsy Corporation.

**MEMORANDUM OPINION AND ORDER REGARDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

BENNETT, District Judge.

## TABLE OF CONTENTS

I. INTRODUCTION AND PROCEDURAL BACKGROUND....................1396

II. STANDARDS FOR SUMMARY JUDGMENT..............................1396

III. FACTUAL BACKGROUND.........................................1398
 A. Undisputed Facts ...............................................1398
 B. Disputed Facts.................................................1400

IV. LEGAL ANALYSIS...............................................1401
 A. Disability Discrimination Under Federal Law ...........................1402
 1. The origins of the ADA.......................................1402
 2. Disability discrimination under the ADA ...........................1405
 a. "Regarded as having" a disability................................1406
 b. Qualified individual with a disability..............................1406
 c. Analytical framework for ADA claims .........................1408
 d. The prima facie case under the ADA............................1408
 3. Muller's qualification for ADA protection............................1411
 B. Disability Discrimination Under Iowa Law...............................1413
 1. Protected disability ..........................................1414
 2. Qualified for the position......................................1415
 3. Remaining elements of the prima facie case ........................1416
 C. Muller's Rehabilitation Act Claim....................................1417
 D. Muller's Claim Under The FMLA ....................................1418
 E. Muller's ERISA Claim .............................................1419
 F. Muller's Wrongful Discharge Claim...................................1420
 G. Muller's Claim Under Iowa Code Ch. 91B .............................1421

V. CONCLUSION .................................................1422

This litigation involves seven causes of action, all of which derive from the termination of plaintiff by his former employer after plaintiff's spinal injury in a motorcycle acci-

dent, and some of which require the court's analysis of the perceptions of plaintiff's supervisor regarding the magnitude of plaintiff's medical condition and the occupational limitations imposed on plaintiff as a result of his perceived injury. Specifically, plaintiff has alleged causes of action under the Americans with Disabilities Act, the Iowa Civil Rights Act, the Rehabilitation Act of 1973, the Family and Medical Leave Act, and the Employee Retirement Income Security Act, along with two pendent state law claims of wrongful discharge and wrongful denial of his personnel file under Iowa Code Chapter 91B. Defendant employer has moved for summary judgment on each of plaintiff's causes of action, and plaintiff has resisted its motion as to each of his claims.

## I. INTRODUCTION AND PROCEDURAL BACKGROUND

On May 25, 1994, Plaintiff Roger Muller filed a complaint against his former employer, the Hotsy Corporation ("Hotsy"), seeking reinstatement to his former position and damages resulting from his termination on August 19, 1993. In his complaint, Muller alleges seven causes of action, including (1) a claim pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq.; (2) a claim under the Iowa Civil Rights Act ("ICRA"); (3) a claim under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794; (4) a claim under the Family and Medical Leave Act (P.L. 103–3); (5) a claim pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq.; (6) a pendent state law wrongful discharge claim; (7) a claim under Iowa Code Chapter 91B premised upon Hotsy's denial of Muller's request to see his personnel file after his termination.

Hotsy answered Muller's complaint on July 29, 1994, and subsequently filed a motion for summary judgment on all of Muller's claims on December 4, 1995. Muller resisted this motion on January 9, 1996, claiming there are material facts in dispute regarding each of his claims. In addition, Muller filed affidavits with the court on January 12, 1996 to supplement his resistance to Hotsy's motion for summary judgment. Likewise, Hot-

sy supplemented its motion for summary judgment on January 29, 1996 with answers to Muller's interrogatories. Lastly, on January 30, 1996, Hotsy filed a reply to Muller's resistance to Hotsy's motion for summary judgment.

On February 15, 1996, a telephonic hearing was held concerning Hotsy's motion for summary judgment. Hotsy was represented by Neven J. Mulholland, Johnson, Erb, Bice, Kramer, Good & Mulholland, Fort Dodge, Iowa. Muller was represented by Blake Parker, Parker Law Office, Fort Dodge, Iowa. Before discussing the factual background of these proceedings, the court will first consider the standards for Hotsy's motion for summary judgment.

## II. STANDARDS FOR SUMMARY JUDGMENT

The Eighth Circuit Court of Appeals recognizes "that summary judgment is a drastic remedy and must be exercised with extreme care to prevent taking genuine issues of fact away from juries." *Wabun–Inini v. Sessions,* 900 F.2d 1234, 1238 (8th Cir.1990). On the other hand, the Federal Rules of Civil Procedure have authorized for nearly 60 years "motions for summary judgment upon proper showings of the lack of a genuine, triable issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). Thus, "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.' " *Wabun–Inini,* 900 F.2d at 1238 (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986)); *Hartnagel v. Norman,* 953 F.2d 394, 396 (8th Cir. 1992).

The standard for granting summary judgment is well established. *Rule* 56 of the Federal Rules of Civil Procedure states in pertinent part:

Rule 56. Summary Judgment

(b) For Defending Party. A party against whom a claim ... is asserted ... may, at any time, move for summary judg-

ment in the party's favor as to all or any part thereof.

(c) Motions and Proceedings Thereon.... *The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*

*Fed.R.Civ.P.* 56(b) & (c) (emphasis added); *see also Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53; *Beyerbach v. Sears,* 49 F.3d 1324, 1325 (8th Cir.1995); *Munz v. Michael,* 28 F.3d 795, 798 (8th Cir.1994); *Roth v. U.S.S. Great Lakes Fleet, Inc.,* 25 F.3d 707, 708 (8th Cir.1994); *Cole v. Bone,* 993 F.2d 1328, 1331 (8th Cir.1993); *Woodsmith Publishing Co. v. Meredith Corp.,* 904 F.2d 1244, 1247 (8th Cir.1990); *Wabun–Inini,* 900 F.2d at 1238 (citing *Fed.R.Civ.P.* 56(c)).[1] A court considering a motion for summary judgment must view all the facts in the light most favorable to the nonmoving party, here Muller, and give Muller the benefit of all reasonable inferences that can be drawn from the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)); *Munz,* 28 F.3d at 796; *Allison v. Flexway Trucking, Inc.,* 28 F.3d 64, 66 (8th Cir.1994); *Johnson v. Group Health Plan, Inc.,* 994 F.2d 543, 545 (8th Cir.1993); *Burk v. Beene,* 948 F.2d 489, 492 (8th Cir.1991); *Coday v. City of Springfield,* 939 F.2d 666, 667 (8th Cir.1991), *cert. denied,* 502 U.S. 1094, 112 S.Ct. 1170, 117 L.Ed.2d 416 (1992).

Procedurally, the moving party, Hotsy, bears "the initial responsibility of informing the district court of the basis for their motion and identifying those portions of the record which show lack of a genuine issue." *Hartnagel,* 953 F.2d at 395 (citing *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553); *see also Reed*

*v. Woodruff County, Ark.,* 7 F.3d 808, 810 (8th Cir.1993). Hotsy is not required by *Rule* 56 to support its motion with affidavits or other similar materials negating the opponent's claim. *Id.*

"When a moving party has carried its burden under *Rule* 56(c), its opponent must do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1355. Muller is required under *Rule* 56(e) to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." *Fed.R.Civ.P.* 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *McLaughlin v. Esselte Pendaflex Corp.,* 50 F.3d 507, 511 (8th Cir.1995); *Beyerbach,* 49 F.3d at 1325. Although "direct proof is not required to create a jury question, ... to avoid summary judgment, 'the facts and circumstances relied upon must attain the dignity of substantial evidence and must not be such as merely to create a suspicion.'" *Metge v. Baehler,* 762 F.2d 621, 625 (8th Cir.1985) (quoting *Impro Products, Inc. v. Herrick,* 715 F.2d 1267, 1272 (8th Cir.1983), *cert. denied,* 465 U.S. 1026, 104 S.Ct. 1282, 79 L.Ed.2d 686 (1984)), *cert. denied sub nom. Metge v. Bankers Trust Co.,* 474 U.S. 1057, 106 S.Ct. 798, 88 L.Ed.2d 774 (1986). The necessary proof that the nonmoving party must produce is not precisely measurable, but the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Allison,* 28 F.3d at 66.

In *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510, *Celotex,* 477 U.S. at 323–24, 106 S.Ct. at 2553–54, and *Matsushita,* 475 U.S. at 586–87, 106 S.Ct. at 1355–56, the Supreme Court established that a summary judgment motion should be interpreted by the trial court to accomplish its purpose of disposing of factu-

---

1. An issue of material fact is genuine if it has a real basis in the record. *Hartnagel v. Norman,* 953 F.2d 394 (8th Cir.1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986)). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Beyerbach,* 49 F.3d at 1326; *Hartnagel,* 953 F.2d at 394.

ally unsupported claims, and the trial judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *Johnson v. Enron Corp.*, 906 F.2d 1234, 1237 (8th Cir.1990). The trial court, therefore, must "assess the adequacy of the nonmovants' response and whether that showing, on admissible evidence, would be sufficient to carry the burden of proof at trial." *Hartnagel*, 953 F.2d at 396 (citing *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552). If Muller fails to make a sufficient showing of an essential element of a claim with respect to which he has the burden of proof, then Hotsy is "entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553; *Woodsmith*, 904 F.2d at 1247. However, if the court can conclude that a reasonable trier of fact could return a verdict for Muller, then summary judgment should not be granted. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510; *Burk*, 948 F.2d at 492; *Woodsmith*, 904 F.2d at 1247.

The Eighth Circuit Court of Appeals has cautioned that "summary judgment should seldom be used in employment-discrimination cases." *Crawford v. Runyon*, 37 F.3d 1338, 1341 (8th Cir.1994) (citing *Johnson v. Minnesota Historical Soc'y*, 931 F.2d 1239, 1244 (8th Cir.1991), and *Hillebrand v. M–Tron Indus., Inc.*, 827 F.2d 363, 364 (8th Cir.1987), *cert. denied*, 488 U.S. 1004, 109 S.Ct. 782, 102 L.Ed.2d 774 (1989)); *see also Hardin v. Hussmann Corp.*, 45 F.3d 262 (8th Cir.1995) ("summary judgments should only be used sparingly in employment discrimination cases," citing *Haglof v. Northwest Rehabilitation, Inc.*, 910 F.2d 492, 495 (8th Cir.1990); *Hillebrand*, 827 F.2d at 364). Summary judgment is appropriate only in "those rare instances where there is no dispute of fact and where there exists only one conclusion." *Johnson*, 931 F.2d at 1244; *see also Webb v. St. Louis Post–Dispatch*, 51 F.3d 147, 148 (8th Cir.1995) (quoting *Johnson*, 931 F.2d at 1244); *Crawford*, 37 F.3d at 1341 (quoting *Johnson*, 931 F.2d at 1244). The court reasoned that "[b]ecause discrimination cases often depend on inferences rather than on direct evidence, summary judgment should not be granted unless the evidence could not support any reasonable inference for the nonmovant." *Crawford*, 37 F.3d at 1341 (holding that there was a genuine issue of material fact precluding summary judgment); *Johnson*, 931 F.2d at 1244. Having discussed these standards, the court turns to an examination of the factual background of this litigation.

## III. FACTUAL BACKGROUND

### A. Undisputed Facts

The summary judgment record reveals the following facts are undisputed. Hotsy is a corporation which produces industrial cleaning equipment. As part of this corporation, Hotsy maintains a production facility in Estherville, Iowa, known as its Detergent Division, where it produces cleaning chemicals for use with its cleaning equipment. Hotsy's office headquarters and principal place of business is located in Englewood, Colorado, which is also the location of the office of Lloyd Rizer, Senior Vice President of Hotsy.

Roger Muller was an employee of Hotsy's detergent division in Estherville, Iowa from October 1983 until August 19, 1993, the date of his termination. At the time of his termination, Muller held the position of plant foreperson in charge of daily production under the supervision of Dean Fernholz, who, in turn, served as the General Manager for the Detergent Division of Hotsy.

At the time of Muller's discharge, Hotsy employed eleven employees at its Estherville, Iowa plant and twenty-one employees at its Humboldt, Iowa plant. The Humboldt plant is the only site within seventy-five miles of the Estherville plant. Between these two plants, Hotsy employed thirty-two employees.[2]

---

2. Muller has disputed this fact, not on the grounds that it is not true, but rather because he contends Hotsy waived the right to prove this fact by not answering Muller's discovery request. However, Hotsy ultimately revealed this fact in an answer to an interrogatory filed on January 29, 1996. Because Hotsy did eventually answer this question, the court finds that Hotsy did not waive its right to prove this fact, and finds that it is an undisputed fact in the case.

On or about February 20, 1992, Hotsy entered into a General Services Administration ("GSA") contract with the United States Government. GSA disseminates a catalog to all governmental agencies and lists in this catalog the guaranteed lowest prices of various companies, including Hotsy. This mail-order catalog benefits the government by allowing government agencies to purchase needed supplies and equipment from the catalog at the lowest price available. The GSA contract between Hotsy and the government covers the period from April 1, 1992 through March 31, 1997.

Muller was injured in a non-work related motorcycle accident on June 10, 1993. Muller suffered from a spinal injury to the seventh thoracic vertebrae and a broken nose and was treated by Dr. Robert Suga, orthopedic surgeon with Midwest Orthopedic Center, Sioux Falls, South Dakota. Because of his injuries, Muller did not work from June 10, 1993 until August 18, 1993.

Hotsy had group long term disability insurance and the terms of this insurance plan were provided in the Summary Plan Description. Under these terms, there is a benefit waiting period of ninety days before an employee begins receiving benefits. To provide pay continuation during this thirteen-week waiting period, a Hotsy employee may request and receive any unused sick leave and/or any unused vacation pay. When the sick leave and vacation have been used, the employee may receive up to thirteen weeks short-term disability pay of $100.00 per week. As of June 10, 1993, Muller had sixteen days vacation and five days sick pay accrued. Muller received full pay from June 11, 1993 through July 12, 1993. He then received twenty-two days of short-term disability from July 13, 1993 through August 18, 1993.

Prior to terminating Muller, Dean Fernholz devised a questionnaire for Muller's doctor, Dr. Suga, and listed what he perceived to be a job description of Muller's position as plant foreperson. Dr. Suga filled out the questionnaire regarding any work restrictions Muller might have. In this questionnaire, Dr. Suga anticipated Muller would be subjected to restrictions for two to three months, commencing August 10, 1993. After receiving Dr. Suga's answers to this questionnaire, Fernholz concluded that, in his opinion, Muller could not perform the "essential functions" of the position of plant foreperson. On August 19, 1993, Muller was discharged from his employment at Hotsy. By August 19, 1993, Muller had been away from work for forty-nine days.[3]

The restrictions Dr. Suga placed on Muller were only temporary restrictions. After Muller's discharge, Rick Ostrander, a certified rehabilitation counselor retained by Muller, offered to come to the plant to do an onsite job analysis for the purpose of determining what accommodations could be made to the job position or job site to allow Muller to continue his employment. Fernholz informed Ostrander that such an analysis would not be necessary. Fernholz opined that "[b]ecause [Fernholz] understood it would be two to three months before [Muller] would be able to return to work, [Muller] was replaced." (Ostrander depos. p. 25, Muller's Statement of Disputed Facts, p. 46).

Following his termination, Muller requested a copy of his personnel file from Fernholz. Muller was not employed by Hotsy at the time he made this request. Hotsy did not give him his file at this time. However, when Muller requested a copy of his personnel file in his First Request for Production of Documents, Hotsy produced the personnel file.

Muller does not claim that he is a handicapped person or has ever had a physical or mental impairment which has substantially limited one or more of his major life activities. Dr. Suga examined Muller in December 1993 and concluded that Muller's condition was excellent and that he had no difficulties with his back. (Suga depos., p. 32). At his deposition on August 15, 1995, Dr. Suga testified that he did not anticipate any further problems with Muller's back and further noted that normally, it takes a

---

**3.** Muller agrees that by August 19, 1993, he had been away from work for forty-nine days, but maintains that he had been away from work for only forty-two days at the time he presented Dr. Suga's questionnaire to Hotsy.

minimum of three months for a fracture of the seventh thoracic spine to heal, at which time the patient should return to all normal functions and normal life activities. (Suga depos., p. 33). At his deposition on March 14, 1995, Muller testified that he did not suffer from a permanent impairment relative to his back injury. (Muller depos., p. 86).

## B. Disputed Facts

The following facts are among those disputed by the parties. Hotsy maintains that, as an employee with Hotsy, Muller was a participant in Hotsy's Group Long Term Disability Insurance Plan and received a copy of the Summary Plan Description. Rizer, the Executive Vice President of Hotsy, stated in his affidavit that Muller never filed a claim under the Long Term Disability Plan following his June 10, 1993 injury. (Rizer Affidavit ¶ 5). In addition, Muller did not comply with the procedures set forth in the Summary for filing a claim and did not request long term disability benefits. Hotsy further asserts that it did not have an opportunity to grant or deny a claim for long term disability benefits for Muller. On the other hand, Muller argues that Hotsy did not allow him to participate in the Long Term Disability Insurance Plan. He alleges that he asked Fernholz for information concerning long term disability after he was discharged, and he was told that he could not apply for long term disability because he was no longer an employee of Hotsy. (Muller Affidavit ¶ 13).

Prior to terminating Muller, Fernholz drafted a questionnaire for Dr. Suga based upon his opinion of a job description of Muller's former position of plant foreperson. Hotsy claims that Fernholz designed this questionnaire for the purpose of determining Muller's limitations. Muller argues that Fernholz constructed this questionnaire, altering Muller's job description, for the purpose of discharging him based upon his limitations. Muller offers affidavits of coworkers as evidence that Fernholz added job duties and conditions into the job description in the questionnaire, duties which Muller had specifically been told not to do and conditions which would not have been performed by the plant foreperson. (Mathiason Affidavit ¶¶ 4–5; Whitacre Affidavit ¶¶ 2–3). Muller maintains that Fernholz created the job description only after he had attempted to formulate a reason to fire him for "just cause." As support for this theory, Muller presents affidavits from coworkers claiming that Fernholz had questioned every employee at the Estherville plant about Muller's possible involvement in incidents of sexual harassment and drinking or abusing drugs on the job. (Mathiason Affidavit ¶ 2; Johnson Affidavit ¶¶ 3–5; Whitacre Affidavit ¶ 4).

In addition, Hotsy claims Fernholz never perceived Muller as being "disabled," but rather as only having a temporary injury. Hotsy maintains Fernholz perceived Muller as having injuries which would keep him from performing the essential functions of plant foreperson as described in the questionnaire to Dr. Suga for two to three months. Hotsy contends that it could not afford to leave Muller's position open and merely cover Muller's duties for two to three months; thus, it had to terminate and replace him. Hotsy insists that Fernholz did not regard Muller as having a physical impairment that substantially limited him in the broader category of work in general; Fernholz only perceived Muller as being unable to perform the job of plant foreperson for two to three months. On the other hand, Muller argues that Fernholz manufactured a false description of Muller's job description as posed to Dr. Suga and further asserts that he could have performed all the tasks of plant foreperson, either without accommodation or with a minimal accommodation of $50.00 per week or between $400.00 to $600.00 for the entire time Muller would have required accommodation. (Letter from Ostrander to Muller's Atty, pp. 67–71; Ostrander depos., pp. 45–58). Muller further claims that Fernholz doubted that Muller could recover within the two to three month time period and implied that he was concerned about Muller's need for additional time off in the future and the possibility of surgery. (Muller Affidavit ¶ 12; Mathiason Affidavit ¶ 3; Muller's Resistance to Hotsy's Mot. for Summ. J., p. 98). Lastly, Muller asserts that Fernholz admitted he thought Muller was too

"disabled" to return to work. (Fernholz depos., p. 98). The court will weigh the materiality of these disputed facts in reaching its decision regarding Hotsy's motion for summary judgment.

## IV. LEGAL ANALYSIS

Hotsy has moved for summary judgment on each of Muller's seven causes of action. First, Hotsy claims that it is entitled to summary judgment on Muller's ADA and ICRA claims because Muller is not "disabled" under either act. Hotsy asserts that Muller did not have a physical impairment that substantially limited one or more of his major life activities. In addition, Hotsy argues that Fernholz did not perceive Muller to be disabled; rather, he regarded Muller's condition as a temporary condition that prevented him from performing the essential functions of his job as plant foreperson. Hotsy also claims that it is entitled to summary judgment on Muller's claim under Section 504 of the Rehabilitation Act because Hotsy does not receive federal financial assistance within the meaning of Section 794 of the Act and thus cannot be liable for such a claim. Regarding Muller's claim under the Family and Medical Leave Act, Hotsy claims that Muller is not eligible for relief under this Act because Hotsy does not have the requisite number of employees at its Estherville, Iowa site alone or in combination with its Humboldt, Iowa site to permit Muller to qualify as an "employee" under the terms of the Act. Hotsy asserts that the court should grant summary judgment as to Muller's ERISA claim. Hotsy maintains that it never denied Muller's claim for long-term disability benefits because he never made a request for benefits under the policy plan. In addition, Hotsy contends that even if Muller had made such a request, under the plan, he was not eligible to receive benefits at the time of his discharge. Muller has also claimed that Hotsy wrongfully discharged Muller to frustrate

his claims for short-term disability, contrary to the terms of ERISA. In response to this wrongful discharge claim, Hotsy maintains that an alleged violation of ERISA is not an appropriate basis for a public policy exception because the ERISA statute creates a statutory cause of action and provides Muller a remedy.[4] Lastly, Hotsy argues that it is entitled to summary judgment on Muller's claim that Hotsy wrongfully deprived him of his personnel file in violation of Iowa Code Chapter 91B. Hotsy asserts that Muller did not request his personnel file until after his discharge; therefore, Muller was no longer an "employee" under Chapter 91B and no longer entitled to view this file upon request. Furthermore, Hotsy contends that Muller has not identified the relief to which he would be entitled for an alleged violation of Chapter 91B. Lastly, Hotsy maintains that this issue is moot considering that Hotsy produced this personnel file upon request through discovery in this litigation and Muller has suffered no damages.

Muller has resisted Hotsy's motion for summary judgment as to each of his seven causes of action. Muller argues he has raised material fact questions concerning Hotsy's ADA and ICRA violations, namely, that Fernholz regarded him as having an impairment that substantially limits a major life activity and that at the time he was perceived as having that impairment, he was qualified to perform the essential functions of his job either with or without reasonable accommodations. Muller also maintains he has raised a material fact question as to whether he was discharged because of Hotsy's perception of his condition. Muller asserts that Fernholz manufactured a job description solely for the purpose of terminating Muller after Fernholz had attempted to establish a reason to fire Muller for "just cause." In addition, Muller argues that Hotsy did, in fact, receive federal financial assistance via a GSA contract with the government to bring Hotsy within the parame-

---

4. Originally, Hotsy perceived Muller's wrongful discharge claim as being based upon Hotsy's alleged discrimination against Muller. Thus, in its brief accompanying its motion for summary judgment, Hotsy argued that Chapter 216 of the Iowa Code preempts Muller's claim that his discharge was in violation of public policy where his claim is based upon discrimination. However, in his resistance brief, Muller argued his claim for wrongful discharge was based upon an alleged ERISA violation; therefore, Hotsy responded to this alternative allegation in its reply brief.

ters of Section 504 of the Rehabilitation Act. Muller also contends that Hotsy has waived its right to assert it is not an "employer" under the Family and Medical Leave Act because it already admitted it was an employer under the FMLA and it had not provided Muller with discovery information regarding the number of employees working at the Estherville and Humboldt plants. Muller further argues that Hotsy also waived its right to argue Muller failed to exhaust his administrative remedies by not filing a claim for benefits and that "[t]he implication as acknowledged by Hotsy's brief is that they avoid payment of disability payments by discharging employees." Concerning his wrongful discharge claim, Muller argues that Hotsy discharged Muller to frustrate his claims for disability benefits, contrary to the terms of ERISA. Lastly, Muller argues that he was, in fact, denied access to his personnel file in violation of Chapter 91B of the Iowa Code in that he had to sue Hotsy to obtain a copy of it.

Having discussed the primary arguments of the parties regarding each cause of action, the court now turns to the disposition of Hotsy's motion for summary judgment on each of Muller's claims.

### A. Disability Discrimination Under Federal Law

Before turning to the merits of Muller's claim under the ADA, the court believes it is beneficial to place it in the context of Congress' endeavors to combat discrimination based on disabilities. Then the court may consider whether Muller comes under the protective umbrella Congress has designed.

### 1. The origins of the ADA

The ADA provides that no employer "shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to ... the hiring, advancement or discharge of employees...."

42 U.S.C. § 12112. This language of the ADA is substantially identical to that of the Rehabilitation Act, 29 U.S.C. § 794, which forbids discrimination "by reason of his handicap." *Hedberg v. Indiana Bell Telephone Co., Inc.,* 47 F.3d 928, 932 (7th Cir.1995).

The ADA and its attendant regulations were enacted, in part, to address perceived inadequacies in the Rehabilitation Act of 1973, 29 U.S.C. § 794. *Helen L. v. DiDario,* 46 F.3d 325, 329 (3d Cir.) (describing in detail the history of Congressional efforts to attack disability discrimination), *cert. denied,* —— U.S. ——, 116 S.Ct. 64, 133 L.Ed.2d 26 (1995). Congress and the Executive found that section 504 of the prior act simply was not working as a means of eradicating discrimination and segregation in this country. For example, Congress found that, even though section 504 had been the law for seventeen years,

> society has tended to isolate and segregate individuals with disabilities, and despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem.

42 U.S.C. § 12101(a)(2). Because Congress found further that public officials historically have been among the major perpetrators of segregated services in this country, *see* Timothy M. Cook, *The Americans With Disabilities Act: The Move To Integration,* 64 TEMP. L.REV. 393, 400, 416 (identifying state laws mandating segregation of persons with disabilities and suggesting an analogy with the "Jim Crow laws" mandating racial discrimination), Title II of the ADA, 42 U.S.C. §§ 12131–12134, incorporates the "non-discrimination principles" of section 504 of the Rehabilitation Act, but extends them to state and local governments. *Helen L.,* 46 F.3d at 331; *Easley v. Snider,* 36 F.3d 297, 300 (3d Cir.1994).[5] Section 202 of Title II provides as follows:

---

**5.** These congressional findings are similar to those of Justice Stevens and Justice Marshall in their concurrences in *Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985), a case involving discrimination against the mentally retarded. Justice Stevens found that "through ignorance and preju-

dice the mentally retarded 'have been subjected to a history of unfair and often grotesque mistreatment.'" *Cleburne,* 473 U.S. at 455, 105 S.Ct. at 3262 (Stevens, J., concurring). Similarly, Justice Marshall found that

[a] regime of state-mandated segregation and degradation soon emerged that in its virulence

[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132.

The ADA was not the first attempt to address the limitations of existing legislation to eradicate discrimination on the basis of disabilities. Periodically through the mid–1980s there had been attempts to amend the Civil Rights Act of 1964 to include people with disabilities. *See, e.g.,* H.R. 370, 99th Cong., 1st Sess. (1985). In 1983, the United States Commission of Civil Rights observed that "[h]andicap discrimination and, as a result, its remedies differ in important ways from other types of discrimination and their remedies," therefore disability rights laws explicitly modeled on prior civil rights statutes were not necessarily effective. U.S. COMM'N ON CIVIL RIGHTS, ACCOMMODATING THE SPECTRUM OF INDIVIDUAL ABILITIES 48, 149 (1983). A federal judge had a more blunt assessment:

> [T]he Title VII and Title IX models were not automatically adaptable to the problem of discrimination against the handicapped, but involved a very different undertaking.
>
> Indeed, attempting to fit the problem of discrimination against the handicapped into the model remedy for race discrimination is akin to fitting a square peg into a round hole....

*Garrity v. Gallen,* 522 F.Supp. 171, 206 (D.N.H.1981). Another commentator identified more specific weaknesses of prior laws that attempted to address disability discrimination:

> Problems involved in trying to transfer principles and legal analysis developed in race and sex discrimination cases wholesale to disability discrimination were interwoven with other difficulties and shortcomings of disability nondiscrimination

statutes prior to the ADA. Experience with the application of such prior statutes, including section 504 of the Rehabilitation Act of 1973, uncovered or highlighted weaknesses of such laws arising from their statutory language, the limited extent of their coverage, inadequate enforcement mechanisms, and erratic judicial interpretations. Legal commentators have extensively described and lamented the flaws in the working, interpretation, and implementation of federal disability nondiscrimination statutes prior to the ADA.

Robert L. Burgdorf, Jr., *The Americans With Disabilities Act: Analysis And Implications Of A Second–Generation Civil Rights Statute,* 26 Harv. C.R.–C.L.L.Rev. 413, 430–31 (1991) (footnotes omitted).

In enacting the ADA, Congress found that "[h]istorically, society has tended to isolate and segregate individuals with disabilities, and ... such forms of discrimination ... continue to be a serious and pervasive social problem." 42 U.S.C. § 12101(a)(2). *Helen L.,* 46 F.3d at 332. The purpose of the ADA in light of this history of discrimination was summarized by Congressman Dellums:

> The history of different, separate, and unequal treatment of persons with disabilities, especially those with severe disabilities, could not be clearer. That history is in fact a stark reminder of the prejudice and misunderstanding that has characterized the treatment of minority citizens. This disparate treatment establishes an abundant factual predicate for the relief granted by [the ADA]. The Americans With Disabilities Act is a plenary civil rights statute designed to halt all practices that segregate persons with disabilities and those which treat them inferior [sic] or differently. By enacting the ADA, we are making a conscious decision to reverse a sad legacy of segregation and degradation.

and bigotry rivaled, and indeed paralleled, the worst excesses of Jim Crow. Massive custodial institutions were built to warehouse the retarded for life; the aim was to halt reproduction of the retarded and "nearly extinguish their race." Retarded children were categorically excluded from public schools, based on the

false stereotype that all were ineducable and on the purported need to protect nonretarded children from them. State laws deemed the retarded "unfit for citizenship."

*Id.* at 462–63, 105 S.Ct. at 3266–67 (Marshall, J., concurring) (footnotes omitted).

136 CONG.REC. H2599 (daily ed. May 22, 1990) (statement of Rep. Dellums). Almost ten years earlier, a disabled legal scholar and disability rights advocate had written that

> [t]he history of society's formal methods for dealing with handicapped people can be summed up in two words: segregation and inequality. Individuals with handicapping conditions have faced an almost universal conspiracy to shunt them aside from the mainstream of society and to deny them an equal share of benefits and opportunities available to others.... At every juncture, the handicapped person has met with attempts to "push" him or her aside and to withhold that which is taken for granted from other persons.

Robert L. Burgdorf, Jr., THE LEGAL RIGHTS OF HANDICAPPED PERSONS: CASES, MATERIALS, AND TEXT 51 (1980).

Before passing the ADA, Congress conducted fourteen hearings at the Capitol, and another sixty-three field hearings, and reviewed hundreds of discrimination diaries submitted for the legislative record by persons with disabilities. AMERICANS WITH DISABILITIES ACT OF 1989: HEARINGS ON S.933 BEFORE THE SENATE COMM. ON LABOR AND HUMAN RESOURCES AND THE SUBCOMM. ON THE HANDICAPPED, 101st Cong., 1st Sess. (1989) (testimony of Justin Dart, Chairman of Task Force on Rights and Empowerment of Americans with Disabilities). Congress was confronted with testimony that

> [b]y almost any definition, Americans with disabilities are uniquely underprivileged and disadvantaged. They are much poorer, much less well educated and have much less social life, have fewer amenities and have a lower level of self-satisfaction than other Americans.

SENATE SUBCOMM. ON THE HANDICAPPED, S. Hrg. 166, pt. 2, at 9 (1987) (statement of Humphrey Taylor); quoted in S.REP. No. 116, 101st Cong., 1st Sess. 8 (1989); also quoted in H.R.REP. No. 485, 101st Cong., 2d Sess., pt. 2, at 31 U.S.Code Cong. & Admin.News 1987, pp. 267, 303, 445, 572, 565 (1990). Congress found that its hearings, investigations, and other sources revealed severe prejudice and discrimination towards disabled persons persisted in this country.

Persons with disabilities, especially those with severe, noticeable disabilities, were told outright that they had been excluded because others would feel uncomfortable around them. *See, e.g.*, S.REP. No. 116, 101st Cong., 1st Sess. 7 (1989), and H.R.REP. No. 485, 101st Cong., 2d Sess., pt. 2, at 30 U.S.Code Cong. & Admin.News 1987, pp. 267, 303, 445, 572, 565 (1990) (a New Jersey zoo keeper refused to admit children with Down's syndrome because he feared they would upset the chimpanzees; and, from remarks of Rep. Vanik, citing as an example of discrimination on the basis of disability from *Alexander v. Choate*, 469 U.S. 287, 307 n. 29, 105 S.Ct. 712, 723 n. 29, 83 L.Ed.2d 661 (1985), a child with cerebral palsy was excluded from public school, although he was academically competitive and his condition was not actually physically disruptive, because his teacher claimed his physical appearance "produced a nauseating effect" on his classmates); 135 CONG.REC. S10720 (daily ed. Sept. 7, 1989) (statement of Sen. Durenberger) (applicant with cerebral palsy described being told she was not qualified for job in metropolitan hospital because fellow employees would not be comfortable working with her); SENATE COMM. ON LABOR AND HUMAN RESOURCES, REP. ON THE AMERICANS WITH DISABILITIES ACT, S.REP. No. 116, 101st Cong., 1st Sess. 7 (1989) (applicant "crippled by arthritis" denied employment in higher education because "college trustees [thought] 'normal students' shouldn't see her"); HOUSE COMM. ON EDUCATION AND LABOR, REP. ON THE AMERICANS WITH DISABILITIES ACT, H.R.REP. No. 485, 101st Cong., 2d Sess., at 42, reprinted in 1990 U.S.CODE CONG. & ADMIN.NEWS 303, 324 (1990) (testimony of Virginia Domini) ("[T]he general public doesn't want to see you doing your laundry, being a case worker, a shopper, or a Mom. It is difficult to see yourself as a valuable member of society, and sometimes it is hard to see yourself as a person worthy of so much more respect than you get from the general public.").

Various draft bills to combat disability discrimination were introduced in 1988, and Congressional hearings followed. H.R. 4498, 100th Cong., 2d Sess., 134 CONG.REC. E1307 (daily ed. April 29, 1988); S. 2345, 100th

Cong., 2d Sess., 134 Cong.Rec. S5110 (daily ed. April 28, 1988). A revised ADA bill was introduced in the 101st Congress on May 9, 1989. S. 933, 101st Cong., 1st Sess., 135 Cong.Rec. S4978 (daily ed. May 9, 1989); H.R. 2273, 101st Cong., 1st Sess., 135 Cong. Rec. H1690 (daily ed. May 9, 1989). The House and Senate versions were eventually reported out of committees, the House version was passed on May 22, 1990, by a vote of 403 to 20. 136 Cong.Rec. H2638 (daily ed. May 22, 1990). Following conferences on differences between the House and Senate versions, the House approved the final version of the bill by a vote of 377 to 28 on July 12, 1990, 136 Cong.Rec. H4629 (daily ed. July 12, 1990), and the following day the Senate passed the ADA by a vote of 91 to 6. 136 Cong.Rec. S9695 (daily ed. July 13, 1990).

In the final form of the ADA, Congress concluded that "[i]ndividuals with disabilities continually encounter various forms of discrimination . . . ." 42 U.S.C. § 12101(a)(5). *Helen L.,* 46 F.3d at 332. In furtherance of the objective of eliminating discrimination against the disabled, Congress stated that "the Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals." 42 U.S.C. § 12101(a)(8); *Helen L.,* 46 F.3d at 332. Thus, the purpose of the ADA is "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(a); *Vande Zande v. State of Wis. Dep't of Admin.,* 44 F.3d 538, 541 (7th Cir.1995). In his remarks to the more than 3,000 people, most of whom had disabilities, gathered on the South Lawn of the White House for the signing ceremony, President Bush described the ADA as an "historic new civil rights Act . . . [,] the world's first comprehensive declaration of equality for people with disabilities." President George Bush, Remarks by the President During Ceremony for the Signing of the Americans with Disabilities Act of 1990, 2 (July 26, 1990) (on file with the Harvard Civil Rights–Civil Liberties Law Review), quoted in Robert L. Burgdorf, Jr., *The Americans With Disabilities Act: Analysis And Implications Of A Second–Generation Civil*

*Rights Statute,* 26 Harv.C.R.–C.L.L.Rev. 413 (1991). Title I of the ADA, prohibiting discrimination in employment on the basis of a disability, became effective on July 26, 1992. Pub.L. 101–336, § 108 ("This title [subchapter] shall become effective 24 months after the date of enactment [July 26, 1990]."). With this historical context for the ADA as background, the court may now turn to the standards it is to apply in answering the threshold question in ADA litigation, "Is the plaintiff disabled enough to seek relief under the ADA?"

### 2. *Disability discrimination under the ADA*

Under the ADA, "disability" is broadly defined to include not only "a physical or mental impairment that substantially limits one or more of the major life activities of [the disabled] individual," but also "ha[ving] a record of such an impairment," or the state of "being regarded as having such an impairment." 42 U.S.C. §§ 12102(2)(A), (B), (C); *Wooten v. Farmland Foods,* 58 F.3d 382, 385 (8th Cir.1995); *Dutcher v. Ingalls Shipbuilding,* 53 F.3d 723, 725 (5th Cir.1995); *Vande Zande,* 44 F.3d at 541; *Bolton v. Scrivner, Inc.,* 36 F.3d 939, 942 (10th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1104, 130 L.Ed.2d 1071 (1995); *Chandler v. City of Dallas,* 2 F.3d 1385, 1391 (5th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1386, 128 L.Ed.2d 61 (1994) ("disability" under ADA means a condition that "substantially limits" major life activity). In seeking further definition of the term "substantially limits" under the ADA, the First Circuit Court of Appeals looked to the regulations implementing the ADA:

> Those regulations indicate that the question of whether an impairment is substantially limiting turns on '(1) the nature and severity of the impairment, (2) the duration or expected duration of the impairment, and (3) the [actual or expected] permanent or long-term impact . . . of, or resulting from, the impairment.' 29 C.F.R. § 1630, App. at 403 (1992).

*Cook v. State of R.I. Dep't of Mental Health, Retardation, & Hospitals,* 10 F.3d 17, 25 n. 10 (1st Cir.1993). ADA regulations, as well

as ADA interpretive guidance, make clear that temporary, minor injuries do not "substantially limit" a person's major life activities. 29 C.F.R. §§ 1630.2(j), 1630 App., at 407.

### a. "Regarded as having" a disability

The Seventh Circuit Court of Appeals found the third prohibition, that the employer regards the employee as disabled, fits with the goals of the ADA, because "[m]any such impairments are not in fact disabling but are believed to be so, and the people having them may be denied employment or otherwise shunned as a consequence." *Vande Zande*, 44 F.3d at 541. The Eighth Circuit recently held in *Wooten v. Farmland Foods*, 58 F.3d 382 (8th Cir.1995), that "a person is 'regarded as having' an impairment that substantially limits the person's major life activities when other people treat that person as having a substantially limiting impairment." *Wooten*, 58 F.3d at 385 (citing 29 C.F.R. § 1630.2(*l* )(3)). The court further found that the focus in determining whether a person is regarded as having a disability is on "the impairment's effect upon the attitudes of others." *Id.* (citing *Byrne v. Board of Educ., Sch. of West Allis*, 979 F.2d 560, 564 (7th Cir.1992)). The Fifth Circuit Court of Appeals surveyed decisions in which courts considered the issue of how limiting an employer must consider an employee's impairment to be before the employer is held to regard the employee as disabled under the Rehabilitation Act and other acts prohibiting discrimination on the basis of a disability. *Chandler*, 2 F.3d at 1391–93. The court noted that in *Forrisi v. Bowen*, 794 F.2d 931 (4th Cir. 1986),

> [t]he Fourth Circuit held that the employer did not regard the employee as handicapped simply because it found that he could not meet the demands of this particular job. "The statutory reference to a substantial limitation indicates instead that an employer regards an employee as handicapped in his or her ability to work by finding the employee's impairment to foreclose generally the type of employment involved."

*Chandler*, 2 F.3d at 1392 (quoting *Forrisi*, 794 F.2d at 934). The court then turned to one of its prior unpublished decisions in which it held that the employer's perception that the employee could work in positions other than the one he had formerly occupied despite his impairment was evidence that the employer did not regard the employee as handicapped, again emphasizing that the employee was not regarded as being substantially limited in a major life activity or in performing work-related functions in general. *Id.* at 1392–93. From this survey, the court concluded that the rule is that

> [a]n employer's belief that an employee is unable to perform one task with an adequate safety margin does not establish per se that the employer regards the employee as having a substantial limitation on [the employee's] ability to work in general.

*Id.* at 1393. The Eighth Circuit likewise found in *Wooten* that "working" does not mean working at a particular job of that person's choice. *Wooten*, 58 F.3d at 386 (citations omitted). The court further held that "an impairment that disqualifies a person from only a narrow range of jobs is not considered a substantially limiting one." *Id.* (quoting *Heilweil v. Mount Sinai Hosp.*, 32 F.3d 718, 723 (2d Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1095, 130 L.Ed.2d 1063 (1995)); *see also Jasany v. United States Postal Serv.*, 755 F.2d 1244, 1249 n. 3 (6th Cir.1985) (court concluded that the employer had not regarded the employee as handicapped because his eyesight prevented his driving, because impairment "that affects only a narrow range of jobs can be regarded either as not reaching a major life activity or as not substantially limiting one.").

### b. Qualified individual with a disability

■ The ADA defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8); *see White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir.1995) (citing this definition from the ADA); *Tyndall v. National Educ. Ctrs.*, 31 F.3d 209, 212 (4th Cir.1994); *and compare School Bd. of Nassau County v. Arline*, 480 U.S. 273, 287 n. 17, 107 S.Ct.

1123, 1131 n. 17, 94 L.Ed.2d 307 (1987) (similar definition in Rehabilitation Act, 29 U.S.C. § 794(a)); *Southeastern Comm. College v. Davis,* 442 U.S. 397, 406, 99 S.Ct. 2361, 2367, 60 L.Ed.2d 980 (1979) (Rehabilitation Act definition). Similarly, the ADA reaches beyond protection of people with disabilities irrelevant to performance of their jobs by defining "discrimination" as including an employer's "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless ... [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the ... [employer's] business." *Vande Zande,* 44 F.3d at 541–42 (quoting 42 U.S.C. § 12112(b)(5)(A)). To put it another way, although the ADA prohibits discharge of a person "because of" a disability, an "employer may fire [an] employee because he cannot perform his job adequately, i.e., he is not a 'qualified individual' within the meaning of the ADA." *Hedberg,* 47 F.3d at 934 (citing 42 U.S.C. § 12111(8)). But before firing such an employee, the employer must consider whether "reasonable accommodation" can be made. *Id.; Vande Zande,* 44 F.3d at 542.

The Fifth Circuit Court of Appeals has formulated a two-pronged test of whether a person is "qualified" within the meaning of the ADA:

> First, we must determine whether the individual could perform the essential functions of the job, i.e., functions that bear more than a marginal relationship to the job at issue. Second, if (but only if) we conclude that the individual is not able to perform the essential functions of the job, we must determine whether any reasonable accommodation by the employer would enable [the individual] to perform those functions.

*Chandler,* 2 F.3d at 1393–94; *see also White,* 45 F.3d at 361–62 (quoting and applying the *Chandler* test of "qualified"); *Tyndall,* 31 F.3d at 213 (citing and applying the *Chandler* test).

There are, of course, limits upon what accommodation is required under the ADA:

> The ADA does not, for example, necessarily insulate from discharge someone whose underlying disability causes him to be frequently drunk on the job. The ADA is not a job insurance policy, but rather a congressional scheme for correcting illegitimate inequities the disabled face. *See* 42 U.S.C. § 12101(a).

*Hedberg,* 47 F.3d at 934. Under the terms of the statute, the accommodation must be "reasonable" and must not impose "undue hardship." 42 U.S.C. § 12112(b)(5)(A); *Vande Zande,* 44 F.3d at 542. In *Vande Zande,* the court considered first what was meant by "reasonable accommodation," then considered the meaning of "undue hardship":

> To "accommodate" a disability is to make some change that will enable the disabled person to work. An unrelated, inefficacious change would not be an accommodation of the disability at all. So "reasonable" may be intended to qualify (in the sense of weaken) "accommodation," in just the same way that if one requires a "reasonable effort" of someone this means less than the maximum possible effort.... It would not follow that the costs and benefits of altering a workplace to enable a disabled person to work would always have to be quantified, or even that an accommodation would have to be deemed unreasonable if the cost exceeded the benefit however slightly. But, at the very least, the cost could not be disproportionate to the benefit. Even if an employer is so large or wealthy ... that it may not be able to plead "undue *hardship,*" it would not be required to expend enormous sums in order to bring about a trivial improvement in the life of a disabled employee....

> [One could argue that] the function of the "undue hardship" safe harbor, like the "failing company" defense in antitrust liability ... is to excuse compliance by a firm that is financially distressed, even though the cost of the accommodation to the firm might be less than the benefit to disabled employees.

> [However, t]his interpretation of "undue hardship" is not inevitable—in fact probably is incorrect. It is a defined term in the Americans with Disabilities Act, and the

definition is "an action requiring significant difficulty or expense," 42 U.S.C. § 12111(10)(A).

*Vande Zande*, 44 F.3d at 542–43. The court therefore concluded that costs and difficulties to the employer, in light of the employer's financial health or survival, and the benefits to the employee were both relevant to the "reasonable accommodation" inquiry. *Id.*

The conclusions of the court in *Vande Zande* concerning the extent of the required accommodation are reinforced by the legislative history of the ADA itself on this point. The report of the House Committee on Education and Labor states:

> The Committee wishes to make it clear that the principles enunciated by the Supreme Court in *TWA v. Hardison*, 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977), are not applicable to this legislation. In *Hardison*, the Supreme Court concluded that under Title VII of the Civil Rights Act of 1964 an employer need not accommodate persons with religious beliefs if the accommodation would require more than a de minimis cost for the employer. By contrast, under the ADA, reasonable accommodations must be provided unless they rise to the level of "requiring significant difficulty or expense" on the part of the employer, in light of the factors noted in the statute—i.e., a significantly higher standard than that articulated in *Hardison*. This higher standard is necessary in light of the crucial role that reasonable accommodation plays in ensuring meaningful employment opportunities for people with disabilities.

H.R.REP. No. 101–485, 101st Cong., 2d Sess., pt. 2, at 68 U.S.Code Cong. & Admin.News 1990, pp. 267, 350 (1990); *see also* H.R.REP. No. 101–485, 101st Cong., 2d Sess., pt. 3, at

40 U.S.Code Cong. & Admin.News 1990, pp. 267, 462 (1990); S.REP. No. 101–116, 101st Cong., 1st Sess. 36 (1989).

### c. Analytical framework for ADA claims

To qualify for relief under the ADA, a plaintiff must establish (1) that he or she is a disabled person within the meaning of the ADA; (2) that he or she is qualified, that is, with or without reasonable accommodation (which the plaintiff must describe), he or she is able to perform the essential functions of the job; and (3) that the employer terminated the plaintiff, or subjected the employee to adverse decision, "because of" the plaintiff's disability. *Price v. S–B Power Tool*, 75 F.3d 362, 364 (8th Cir.1996); *Benson v. Northwest Airlines*, 62 F.3d 1108, 1112 (8th Cir.1995); *Wooten*, 58 F.3d at 385; *White*, 45 F.3d at 361; *Mason v. Frank*, 32 F.3d 315, 318–19 (8th Cir.1994); *Tyndall*, 31 F.3d at 212; *Chandler*, 2 F.3d at 1390; *Gilbert v. Frank*, 949 F.2d 637, 640–42 (2d Cir.1991); *Lucero v. Hart*, 915 F.2d 1367, 1371 (9th Cir.1990). The analytical framework employed by courts confronted with claims pursuant to the ADA has generally been the familiar *McDonnell Douglas* shifting burdens analysis. *See, e.g., Price*, 75 F.3d at 364; *White*, 45 F.3d at 361; *Aikens v. Banana Republic, Inc.*, 877 F.Supp. 1031, 1038 (S.D.Tex.1995); *West v. Russell Corp.*, 868 F.Supp. 313, 316 (M.D.Ala.1994).[6]

### d. The prima facie case under the ADA

Although courts have applied the *McDonnell Douglas* framework with some consistency, this court finds that the circuit courts of appeals have been somewhat reluctant to articulate the proper *prima facie* case for ADA claims with which to begin the analysis. In *Hedberg*, the Seventh Circuit Court of Appeals considered, without deciding,[7] the

---

**6.** All of the cases cited below as grappling with the question of the proper *prima facie* case under the ADA also naturally assume that the *prima facie* case is part of a *McDonnell Douglas* analysis. The court has only cited here cases that contain some discussion of the propriety of applying this analysis to an ADA claim.

The analytical framework of shifting burdens referred to in the body of this opinion was developed in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973),

and refined in *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981), and most recently in *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). *Gaworski v. ITT Commercial Fin. Corp.*, 17 F.3d 1104, 1108 (8th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 355, 130 L.Ed.2d 310 (1994).

**7.** The court stated, "We need not decide the precise elements of a *prima facie* case of discrim-

elements of a *prima facie* case under the ADA. *Hedberg,* 47 F.3d at 933 n. 5. The court confined itself to the question of what role the employer's knowledge of the plaintiff's disabilities would play in the plaintiff's *prima facie* case where those disabilities are not obvious. *Id.*

The court concluded first that where the employer did not know of the plaintiff's disabilities, the employer could not have discharged the plaintiff "because of" the disability. *Id.* at 933. The court in *Hedberg* identified a number of courts that had come to similar conclusions under the ADA or analogous statutes designed to prevent disability discrimination. *Id.; see also Landefeld v. Marion Gen. Hosp., Inc.,* 994 F.2d 1178 (6th Cir.1993) (where employer knew nothing of handicap, employer could not be liable under the Rehabilitation Act); *Mazzarella v. United States Postal Serv.,* 849 F.Supp. 89, 96–97 (D.Mass.1994) (holding that lack of knowledge of decisionmaker who fired an employee with a mental disorder precluded liability under the Rehabilitation Act); *Grinstead v. Pool Co. of Texas,* 1994 WL 25515 (E.D.La.1994) (holding that there can be no liability under the ADA for firing a worker with a 20% disability rating when the plaintiff produced no evidence that the employer knew of the disability); *aff'd without op.,* 26 F.3d 1118 (5th Cir.1994); *McIntyre v. Kroger Co.,* 863 F.Supp. 355, 358–59 (N.D.Tex.1994) (holding that there could be no liability under Texas human rights law that forbade discharge "because of disability" for employer's discharge of mentally ill employee, where plaintiff produced no evidence that the employer knew of the disability); *Dutson v. Farmers Ins. Exchange,* 815 F.Supp. 349, 352 (D.Or.1993) (holding that where there was no evidence that an employer knew of its employee's being HIV-positive, the employer could not have illegally discriminated against the employee), *aff'd without op.,* 35 F.3d 570 (9th Cir.1994); *O'Keefe v. Niagara Mohawk Power Corp.,* 714 F.Supp. 622, 627 (N.D.N.Y.1989) (holding that there could be no liability under New York human rights law, forbidding discharge "because of disability," where there was no genuine issue of material fact that those who decided to fire the plaintiff knew nothing of his alcoholism)

The court in *Hedberg* also concluded that

Where disabilities are not obvious, it may be that part of the plaintiff's *prima facie* case would be to demonstrate knowledge of the disability on the employer's part, as is necessary for Title VII religious discrimination. *See Beasley [v. Health Care Serv. Corp.],* 940 F.2d [1085,] 1088 [ (7th Cir. 1991) ]; *Redmond [v. GAF Corp.],* 574 F.2d [897,] 901–02 [ (7th Cir.1978) ]. All we decide today, however, is that where there is no genuine issue that an employer did not know of an employee's disability when it decided to fire him, the employee cannot make out a case of discriminatory discharge.

*Hedberg,* 47 F.3d at 933 n. 5. The court rejected that notion that an employee fired because of "symptoms" of his disability has been fired "because of" the disability where those "symptoms" may have any number of sources other than disability, remarking that "[t]he ADA does not require clairvoyance." *Id.* at 933. Only if the employer knows of the disability, or if the "symptoms are so obviously manifestations of an underlying disability that it would be reasonable to infer that an employer actually knew of the disability," do the provisions of the ADA become binding. *Id.* Similarly, where the disability discrimination plaintiff fails to establish that he or she was treated differently from other persons, the plaintiff has failed to establish one element of a *prima facie* disability discrimination case, and no further inquiry is needed. *Owens v. United States Postal Serv.,* 37 F.3d 1326, 1328 (8th Cir. 1994).

However, finding themselves in the quandary of being left without precise guidance from the circuit courts of appeals articulating the proper *prima facie* case for an ADA plaintiff, the district courts have hit upon two possible formulations, as demonstrated by a sampling of recent ADA decisions. In one group are those courts that apply a *prima facie* case that is indistinguishable from the

elements of an ADA case as described above: a plaintiff must establish (1) that he or she is a disabled person within the meaning of the ADA; (2) that he or she is qualified, that is, with or without reasonable accommodation (which the plaintiff must describe), he or she is able to perform the essential functions of the job; and (3) that the employer terminated the plaintiff, or subjected the employee to adverse decision, "because of" the plaintiff's disability. *See, e.g., Ricks v. Xerox Corp.*, 877 F.Supp. 1468, 1474 (D.Kan.1995); *Howe v. Hull,* 873 F.Supp. 72, 78 (N.D.Ohio 1994). In another group are those courts applying a *prima facie* case more obviously adapted from the one used in other employment discrimination cases: the plaintiff must establish (1) that he or she is disabled within the meaning of the ADA; (2) he or she is a "qualified individual" within the meaning of the ADA; (3) the plaintiff was subject to an adverse employment decision; and (4) the plaintiff was replaced by a non-disabled person or was treated less favorably than non-disabled employees. *See, e.g., Zambelli v. Historic Landmarks, Inc.,* 1995 WL 116669 (E.D.Pa.1995); *Aikens,* 877 F.Supp. at 1038; *Rogers v. International Marine Terminals, Inc.,* No. 94–0056, 1995 WL 16787, at *3 (E.D.La., Jan. 17, 1995); *Aucutt v. Six Flags Over Mid–America, Inc.,* 869 F.Supp. 736 (E.D.Mo.1994); *Stradley v. Lafourche Communications, Inc.,* 869 F.Supp. 442, 443 (E.D.La.1994); *West v. Russell Corp.,* 868 F.Supp. 313, 317 (M.D.Ala.1994).[8] Other courts, without deciding the precise formulation of the *prima facie* case have held that failure to make some specific showing meant that the plaintiff could not establish a *prima facie* case. *See, e.g., Jeanine B. v. Thompson,* 877 F.Supp. 1268, 1286–87 (E.D.Wis. 1995) (failure to allege that plaintiffs were disabled persons was fatal to *prima facie* case under ADA and Rehabilitation Act); *Garcia–Paz v. Swift Textiles, Inc.,* 873 F.Supp. 547, 554 (D.Kan.1995) (although defendant asserted plaintiff could not show any of the elements of a typical discrimination claim, the court found plaintiff had failed to establish a *prima facie* case because the plaintiff could not show that she was a "qualified individual with a disability").

▄▄▄ This court agrees with those decisions holding that the proper *prima facie* case under the ADA is that most closely resembling the *prima facie* showing required for other forms of employment discrimination: the plaintiff need not show at the *prima facie* case phase that he or she was terminated "because of" a disability. Rather, the plaintiff need only make a showing that gives rise to an *inference* of discrimination on the basis of disability. Hence, the plaintiff must show that he or she suffered an adverse employment decision, and that plaintiff was replaced by a non-disabled person, one with a lesser disability, or one whose disability is more easily accommodated, or the plaintiff was treated less favorably than non-disabled employees, those with lesser disabilities, or those whose disabilities are more easily accommodated.

▄▄▄ The court admits that no other authority has included in its formulation of the *prima facie* case under the ADA the comparison of the plaintiff with persons with lesser or more easily accommodated disabilities. However, the court does not believe that the protections of the ADA come into play only if the disabled plaintiff was replaced by or treated less favorably than a *non*-disabled person, just as in an ADEA case, it is not necessary that the plaintiff be replaced with a person from outside the protected class, only that the plaintiff be replaced by a *younger* person. *Rinehart v. City of Independence, Mo.,* 35 F.3d 1263, 1265–66 (8th Cir. 1994), *cert. denied,* — U.S. ——, 115 S.Ct. 1822, 131 L.Ed.2d 744 (1995). A plaintiff has been terminated "because of" his or her disability just as surely where the employer terminates the plaintiff in favor of another who also fits within the ADA's definition of "disabled," but whose disability is more cheaply or easily accommodated, as when the plaintiff is terminated in favor of a non-disabled person. If the ADA permitted such substitution of persons with less severe or

---

**8.** Courts using both formulations of the *prima facie* case cite *White,* 45 F.3d at 361, as supporting their formulation of the test, which is indicative of the uncertainty created by the silence of the circuit courts of appeals on this issue.

more easily accommodated disabilities for those with more severe or less easily accommodated ones, it would be created a scenario wherein employers were permitted to discriminate among members of the ostensibly protected class. The ADA's requirement that accommodation be reasonable already provides sufficient protection to employers from "undue hardship," but preserves the outer limits in defining the class of disabled persons, rather than allowing employers to control whom the ADA protects.

### 3. Muller's qualification for ADA protection

■ The court must now address what it has described as the typical or threshold question in an ADA case, "Is Muller disabled enough to seek relief under the ADA?" Here, Muller is not arguing that he is or was disabled; rather, Muller contends that Fernholz regarded him as having a spinal injury that substantially limited a major life activity, namely, his ability to work. See 29 C.F.R. § 1630.2(i) (ADA regulations include working as a major life activity). Thus, because of Fernholz's perceptions of Muller's spinal injury as a disability, Muller maintains he has a viable cause of action under the ADA. Because Muller's arguments rest upon Fernholz's perceptions of the severity and duration of Muller's impairment and the substantial limitations on his ability to work, the court will analyze whether Muller has raised material fact questions regarding Fernholz's perceptions of Muller's condition to determine whether Muller is "disabled enough to seek relief under the ADA."

■ An impairment or condition that affects "only a narrow range of jobs" is not considered as reaching a major life activity nor as not substantially limiting one. See Wooten, 58 F.3d at 386; Chandler, 2 F.3d at 1392 (quoting Jasany, 755 F.2d at 1249 n. 3). Furthermore, an employer's belief that an employee is unable to perform one task with an adequate safety margin or that an employee can work in positions other than the one formerly occupied despite his impairment does not establish that the employer regards the employee as having a substantial limitation on the employee's ability to work

in general. Chandler, 2 F.3d at 1392–93. Here, the record reveals that although Fernholz claims he thought Muller's spinal injury was only temporary, he admitted in his deposition that he considered Muller disabled due to his impairment. In addition, he expressed concern to Muller, Muller's wife, and David Mathiason, a former co-worker of Muller, that he was afraid that if he allowed Muller to come back to work, Muller would either re-injure himself or somehow further delay his recovery. Mathiason stated that at a meeting of all the Estherville employees, Fernholz "indicated that it was his belief that allowing Roger to return to work would be detrimental to Muller's health." (Mathiason Affidavit ¶ 3). Fernholz further conveyed to Muller's wife that he found it "hard to believe that [Muller] could ever recover from such a severe injury, especially as quick as two to three months." (Kathy Muller Affidavit ¶ 3). In addition, Muller himself alleges that Fernholz indicated the reason for Muller's discharge was that "with the potential of surgery being performed in the past that he had a real concern for bringing [Muller] back to work and potentially causing [Muller] to reinjure [him]self." (Muller Affidavit ¶ 12). While Fernholz asserts that he believed Muller's injury was only a temporary one and that he terminated Muller because he could not leave Muller's position open while Muller recovered, the court concludes Muller has raised a material fact question as to whether Fernholz regarded Muller as having more than a temporary impairment under the ADA.

In addition, the court must consider whether Fernholz perceived Muller as having a disability that substantially limited his ability to work. As discussed above, Fernholz allegedly conveyed to Muller's wife that he found it "hard to believe that [Muller] could ever recover from such a severe injury, especially as quick as two to three months." (Kathy Muller Affidavit ¶ 3). Hotsy argues that Wooten precludes a finding that Muller has raised a material question of fact on the issue of substantial limitation on a major life activity. In Wooten, Farmland Foods' perception of Wooten's impairment was based upon a doctor's written restriction of Wooten's physical activities, and the doctor's

written restriction gave no indication that Wooten's major life activities were substantially limited. *Wooten,* 58 F.3d at 386. Rather, the doctor indicated that "Wooten was restricted to light duty work with no meat products and no work in a cold environment." *Id.* The court found that even if the nurse at Farmland Foods believed that Wooten's restrictions were permanent, "working with meat products in a cold environment would not substantially limit Wooten's major life activities." *Id.* Thus, the court concluded Wooten's impairments, whether considered to be permanent or temporary, only appeared to prevent him from performing a narrow range of meatpacking jobs. *Id.* Hotsy contends that even if Fernholz perceived Muller's injury as permanent, he never perceived Muller as being substantially limited in his ability to find work in general. The court finds, however, that the restrictions Dr. Suga placed on Muller's ability to work, based upon Fernholz's description of Muller's job duties, precluded Muller from performing the job of plant foreperson, which, as Muller, Mathiason, and Whitacre stated in their affidavits, entailed mostly duties of a light nature, including supervisory tasks such as walking the floor to check other employees' work, as opposed to more physical work, such as "lifting, pushing, pulling, or anything else which could be construed as heavy...." (Mathiason Affidavit ¶ 4). In fact, Mathiason claimed Fernholz refused to let Muller complete any of the physical work and reprimanded Muller for attempting to do so. (Mathiason Affidavit ¶ 4). Thus, the record reveals Fernholz perceived Muller as being precluded from performing light work, which, in turn, arguably precluded Muller from performing a variety of jobs, as opposed to a "narrow range" of jobs. *Cf. Wooten,* 58 F.3d at 386. Because the court finds there is at least a material question of fact as to whether Fernholz regarded Muller as "substantially limited" in his ability to work, the court finds the facts in *Wooten* are distinguishable from those in this case.

While Muller has not presented much evidence to support his claim that Fernholz regarded him as having an injury that substantially limited his ability to work, the standards for summary judgment do not require the plaintiff to show more than one material question of fact. Particularly in employment discrimination cases, summary judgment should only be granted in those unusual circumstances "where there is no dispute of fact and where there exists only one conclusion," *see Johnson,* 931 F.2d at 1244, or "where the evidence could not support any reasonable inference for the nonmovant." *See Crawford,* 37 F.3d at 1341. According to Kathy Muller, Fernholz conveyed his perception whether Muller could *ever* recover from such a severe injury, implying that he doubted Muller could *ever* return to work. This creates at least a reasonable inference that Fernholz believed Muller was substantially limited in his ability to work. Thus, the court finds that this alleged statement from Fernholz to Kathy Muller creates a dispute of fact that precludes summary judgment on the issue of whether Fernholz regarded Muller as having an impairment that substantially impaired his ability to work.

Having concluded that Muller has raised material fact questions as to whether Fernholz regarded him as disabled under the ADA, the court proceeds to examine whether Muller is a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *See* 42 U.S.C. § 12111(8); *White,* 45 F.3d at 360. After Muller's accident, Fernholz drafted a job description of Muller's position as plant foreperson. This description was based solely on Fernholz's perceptions and opinions of the "essential functions" of this job. However, in posing a questionnaire to Dr. Suga, Fernholz listed numerous functions and physical requirements of the job of plant foreperson that he not only did not ask Muller to perform, but that he would not permit Muller to perform. In addition to Muller's own account of his job history and the tasks he was to complete, two of Muller's former co-workers have submitted affidavits, claiming that [Muller] did "virtually no lifting, pushing, pulling, or anything else which could be construed as heavy ..." (Mathiason Affidavit ¶ 4); (*See also* Whitacre

Affidavit ¶¶ 2–3). Muller's work was clearly supervisory and normally required him to walk from one employee's area to another, insuring the employees were doing what they were supposed to be doing in a safe manner. (Mathiason Affidavit ¶ 4). Mathiason further stated that Fernholz would not let Muller complete any of the physical work and that he had witnessed Fernholz instructing Muller to stop helping the workers, and "to get back to supervising." (Mathiason Affidavit ¶ 4). Fernholz maintains the job description he concocted with all of the "necessary job requirements" of a plant foreperson served as the basis for his conclusion that Muller could not perform the essential functions of his job. Considering Muller's differing account of his job requirements and Mathiason's supporting statements, the court finds that Muller has created at least a material fact question concerning whether Fernholz's description of the essential functions of plant foreperson was an accurate one.

Furthermore, Rick Ostrander, a rehabilitation therapist, testified in his deposition that even with the restrictions given by Dr. Suga based upon Fernholz's description of plant foreperson, Muller was capable of performing the essential functions of his job with accommodations costing less than fifty dollars per week. Ostrander's testimony, coupled with the affidavits of both Muller and Mathiason indicating their perceptions of the essential functions of the position of plant foreperson and Muller's testimony of his own capabilities, indicate that there are material fact questions as to whether Muller is a "qualified individual with a disability," who could, with or without reasonable accommo-

dation, perform the essential functions of the job of plant foreperson at Hotsy.

In addition to showing that he is disabled and that he is a qualified individual under the ADA, Muller must also establish that he was subject to an adverse employment decision and that he was replaced by a non-disabled person, one with a lesser disability, or one whose disability is more easily accommodated. *See Price*, 75 F.3d at 366 (citing *Johnson v. Legal Serv. of Arkansas, Inc.*, 813 F.2d 893, 896 (8th Cir.1987)). Muller has shown that he was terminated, and the record further reveals that he was replaced by two non-disabled persons. The last element Muller must show to establish a *prima facie* case under the ADA is the inference of discrimination on the basis of disability. *Price*, 75 F.3d at 365 (citations omitted). Here, Fernholz did not compose the job description of plant foreperson until after Muller was injured and included requirements that neither Muller nor Muller's co-workers had ever witnessed Muller performing, nor that Fernholz allowed Muller to perform.[9] Therefore, the court finds Muller has raised a material fact question indicating an inference of discrimination because of his regarded disability to satisfy his burden of establishing a *prima facie* case under the ADA. Thus, Hotsy's motion for summary judgment on Muller's ADA claim is denied.

### B. Disability Discrimination Under Iowa Law

Muller has also alleged disability discrimination in violation of Iowa Code Ch.

9. In addition, after Muller's accident, Fernholz asked each employee if they had knowledge of Muller's participation in the alleged sexual harassment of a co-employee, Denise Johnson, and alcohol or drug use on the job. Denise Johnson submitted an affidavit, stating that Fernholz and his wife insinuated that the real reason she was leaving Hotsy was because she was sexually harassed by Muller. When Johnson insisted that Muller never sexually harassed her, the Fernholzes asked her if she was aware of Muller's alleged use of alcohol and drugs on the job. She further claimed she was not aware that Muller abused alcohol or drugs on the job.

Hotsy has claimed that the reason it terminated Muller was because his disability was temporary, and it could not leave Muller's position

open for even a relatively short period of time. Under *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), Muller is entitled to present evidence to prove that Hotsy's reason for terminating him was pretextual and that intentional discrimination was the true reason for Hotsy's actions. *Hicks*, at 506–07, 113 S.Ct. at 2747. Based upon the affidavits submitted by Muller and his former co-employees, it is apparent Muller has created a material fact question as to whether Hotsy's reason for terminating Muller was pretextual and whether Hotsy intentionally discriminated against Muller because Fernholz regarded him as having a disability that substantially limited his ability to work.

216. Iowa Code § 216.6 (formerly § 601A.6) makes it an unfair or discriminatory employment practice to "discharge" or "otherwise discriminate" against any employee "because of" a disability "unless based upon the nature of the occupation." Iowa Code § 216.6; *Sierra v. Employment Appeal Bd.*, 508 N.W.2d 719, 722 (Iowa 1993). The elements of a case of disability discrimination under Iowa law are that the plaintiff must prove that he or she (1) has a disability; (2) was qualified for the position; and (3) was discharged (or suffered adverse employment decisions) because of his or her disability. *Boelman v. Manson State Bank*, 522 N.W.2d 73, 79 (Iowa 1994). Thus, the *prima facie* case the plaintiff must present is as follows:

> (1) that the employee belongs to a protected group; (2) that the employee was qualified to retain the job; (3) the employee was terminated; and (4) it is more likely than not that the termination was based on an impermissible consideration.

*Miller v. Sioux Gateway Fire Dep't*, 497 N.W.2d 838, 840 (Iowa 1993) (citing *Hamer, infra*); *Henkel Corp. v. Iowa Civil Rights Comm'n*, 471 N.W.2d 806, 809 (Iowa 1991); *Hamer v. Iowa Civil Rights Comm'n*, 472 N.W.2d 259, 264 (Iowa 1991). If the plaintiff establishes a *prima facie* case by the preponderance of the evidence, the burden then shifts to the employer to rebut the presumption of discrimination with evidence of a legitimate, non-discriminatory reason for its actions. *Smith v. ADM Feed Corp.*, 456 N.W.2d 378, 385 (Iowa 1990).[10] The court will consider each of the elements of Muller's *prima facie* case of disability discrimination under Iowa law.

### 1. Protected disability

 The threshold inquiry is whether the plaintiff can show that he or she is a disabled person subject to protection under Iowa Code § 216.6. *Miller*, 497 N.W.2d at 841; *Henkel Corp.*, 471 N.W.2d at 809; *Monson v. Iowa Civil Rights Comm'n*, 467 N.W.2d 230, 232–33 (Iowa 1991). Under Iowa law, a handicapped or disabled person is defined as "any person who has a physical or mental impairment which substantially limits one or more of such person's major life activities, has a record of such impairment, or is regarded as having such impairment." *Miller*, 497 N.W.2d at 841; *Henkel*, 471 N.W.2d at 810; *Probasco v. Iowa Civil Rights Comm'n*, 420 N.W.2d 432, 434 (Iowa 1988). Although the impairment must significantly decrease the plaintiff's ability to obtain satisfactory employment otherwise, *Henkel*, 471 N.W.2d at 810; *Probasco*, 420 N.W.2d at 436, the plaintiff need not be "almost unemployable because of [the plaintiff's] impairment to be considered disabled." *Henkel*, 471 N.W.2d at 810. Rather, the plaintiff's disability must limit one or more of the plaintiff's "major life activities," which have been defined in 161 Iowa Admin.Code § 8.26(3) as including "caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Henkel*, 471 N.W.2d at 810; *Mon-*

**10.** Thus, under Iowa law, there is no uncertainty about the application of a burden-shifting analysis or about the elements of the *prima facie* case as there was with Muller's ADA claim.

Another distinction between claims of disability discrimination based on the ADA and those based on Iowa law exists in the meaning of reasonable accommodation under each act. The Iowa Supreme Court embraced the standard for accommodation of disabilities articulated by the United States Supreme Court in *TWA v. Hardison*, 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977), which was specifically rejected in the legislative history of the ADA. *Cerro Gordo County Care Facility v. Iowa Civil Rights Comm'n*, 401 N.W.2d 192, 197 (Iowa 1987) ("we require a reasonable effort by the employer in carrying out [accommodation of an employee's disability]," but citing *Hardison*, the employer is not required "to bear more than a de minimis

cost" in its obligation to accommodate the employee); *Frank v. American Freight Sys., Inc.*, 398 N.W.2d 797, 802–03 (Iowa 1987) (truck driver's employer was "justified in looking ahead to the situation, which the medical evidence shows to be probable, in which [the plaintiff] will not be able to do the job. In that situation, other employees would be required to fill in for him. [The plaintiff's] team driver might be required to do all of the heavy work, including the loading and lifting. To hold, as the district court did, that this would be reasonable accommodation, we believe was erroneous," citing *Hardison* for the standard for "reasonable accommodation"). The rejection of the *Hardison* standard under the ADA was discussed above. The Iowa Supreme Court has not repudiated this standard for reasonable accommodation under Iowa law since the passage of the ADA.

*son,* 467 N.W.2d at 233; 161 Iowa Admin.Code § 8.26(3). Additionally, the impairment must "disqualif[y] [the employee] from a wide range of other available jobs." *Hollinrake v. Iowa Law Enforcement Academy,* 452 N.W.2d 598, 604 (Iowa 1990).

▮ The court concluded above that Muller had raised material fact questions as to whether Fernholz regarded Muller as having an impairment that substantially limited his ability to work. Under Iowa law, however, the court must examine whether Fernholz perceived Muller as having an impairment that disqualified the employee from a wide range of other available jobs. *See Hollinrake,* 452 N.W.2d at 604. In *Hollinrake,* the Iowa Supreme Court reiterated the standards for the degree of impairment necessary to constitute a protected disability previously stated in *Probasco,* 420 N.W.2d 432, 436 (Iowa 1988):

> The degree to which an impairment substantially limits an individual's employment potential must be determined with reference to a number of factors: the number and type of jobs from which the impaired individual is disqualified, the geographical area in which the individual has reasonable access, and the individual's job training, experience and expectations. An impairment that interferes with an individual's ability to do a particular job but does not significantly decrease the individual's ability to obtain satisfactory employment otherwise is not substantially limiting within our statute.

*Hollinrake,* 452 N.W.2d at 604 (quoting *Probasco* with other citations omitted). While the plaintiff in *Hollinrake* was limited in the particular job of being a peace officer, because of deficiencies in his visual acuity, the court held that he was "not limited in any significant way from obtaining other satisfactory employment," and thus was not "truly disabled" such that he could engage the protection of the Iowa Civil Rights Act. *Id.*

▮ Based upon Fernholz's own testimony that he perceived Muller as disabled, the representations made by Fernholz to Muller, Muller's wife, and Mathiason regarding his doubts of the temporary nature of Muller's condition, and Fernholz's alleged statements that any further work would aggravate Muller's condition, the court concludes that there is evidence in the summary judgment record that Fernholz perceived Muller as "limited in a significant way from obtaining other satisfactory employment," or disqualified from a wide range of other available jobs. Thus, the court finds Muller has raised a material fact question as to whether he is "disabled" within the meaning of the Iowa Civil Rights Act.

### 2. Qualified for the position

▮ Under Iowa law, as under federal law, whether a person is "qualified" for a position depends upon whether that person's disability can be reasonably accommodated. *Boelman,* 522 N.W.2d at 79. An employer must accommodate an employee's disability unless "the accommodation would impose an undue hardship." *Id.* (citing both 45 C.F.R. § 84.12(a) (1993), and 161 Iowa Admin.Code §§ 8.27(6), 8.28 (1993)); *Sierra,* 508 N.W.2d at 722 (Iowa Code § 216.6 requires employers to make "reasonable accommodations"); *Foods, Inc. v. Iowa Civil Rights Comm'n,* 318 N.W.2d 162, 167 (Iowa 1982). Thus, under Iowa law, a person "is qualified if [the person], with or without reasonable accommodation, 'can perform the essential functions of the position in question without endangering the health and safety of [the person] or others....'" *Id.* at 80. This standard imposes a two-prong test upon the plaintiff: (1) can the plaintiff perform the "essential functions" of the job, and (2) whether any reasonable accommodation by the employer would enable the plaintiff to perform those functions. *Id.* To put it another way, the standard for whether a person is qualified for a job requires the court to consider "the individual's ability to perform the job in a reasonably competent and satisfactory manner given reasonable accommodation by the employer." *Henkel,* 471 N.W.2d at 810; *Cerro Gordo County Care Facility,* 401 N.W.2d at 192; 161 Iowa Admin.Code § 8.27(6).

▮ Neither Iowa nor federal law requires the defendant to change the essential nature of the job in order to accommodate the disabled employee's deficiencies. *Boel-*

*man,* 522 N.W.2d at 81. However, "[r]eason-able accommodation by the employer may take many forms." *Sierra,* 508 N.W.2d at 722 (quoting *Cerro Gordo County Care Facility,* 401 N.W.2d at 197). "Reasonableness" is a "flexible standard" and "must be measured not only by the disabled employee's needs and desires, but also by the economic and other realities faced by the employer." *Sierra,* 508 N.W.2d at 722 (quoting *Cerro Gordo County Care Facility,* 401 N.W.2d at 197). Thus, a "reasonable accommodation must be made by an employer only if it does not substantially impinge on the rights of other employees or incur more than de minimis costs to the employer." *Miller,* 497 N.W.2d at 842 (quoting *Brown v. Hy-Vee Food Stores, Inc.,* 407 N.W.2d 598, 599 (Iowa 1987)); *Smith,* 456 N.W.2d at 386; *Davenport v. City of Des Moines,* 430 N.W.2d 405, 408 (Iowa 1988). For example, where the accommodation might slow the employer's business or require the employer to hire outside employees to do the work, the accommodation comes at more than de minimis cost to the employer. *Smith,* 456 N.W.2d at 386.

 The Iowa Supreme Court recently addressed the allocation of burdens on the issue of reasonable accommodation in *Boelman v. Manson State Bank,* 522 N.W.2d 73 (Iowa 1994):

> [T]he plaintiff must produce enough evidence to make a facial showing that reasonable accommodation is possible.
>
> Upon such a showing, the burden shifts to the employer to prove that it is not able to accommodate the plaintiff's disability or that the proposed accommodation is unreasonable. An accommodation is unreasonable if it requires the employer to change the essential nature of the job or if it places undue burdens on the employer.

*Boelman,* 522 N.W.2d at 80 (citations omitted). The court reads this requirement to impose upon the plaintiff a duty to propose an accommodation before the burden shifts to the defendant to show that the proposed accommodation is unreasonable.

 In the present case, Muller has opined that he could perform the "essential functions" of his job with or without reason-able accommodations, as he had always performed the job of plant foreperson, despite Fernholz's additional requirements and the resulting restrictions articulated by Dr. Suga. In addition, both Dr. Suga and Rick Ostrander, the rehabilitation therapist, opined that Muller could perform the essential functions of the job of plant foreperson with a minimal accommodation of fifty dollars per week. Thus, the court finds Muller has generated a material issue of fact as to whether Hotsy could accommodate his condition and that the accommodation was reasonable.

### 3. Remaining elements of the prima facie case

 In addition, to establish his *prima facie* case of disability discrimination under the ICRA, the court must consider whether Muller has generated material fact questions that he suffered an adverse employment decision and that Hotsy's employment decision "is more likely than not ... based on an impermissible consideration." *Miller,* 497 N.W.2d at 840–41. The Iowa Supreme Court has recognized that a plaintiff claiming disability discrimination has a "small target" at which to aim: the plaintiff must show that his or her "physical impairment qualifies as serious enough to bring it within the ambit of the civil rights Act, but is not so serious as to place [the plaintiff] beyond the need for reasonable accommodation by [the plaintiff's] employer." *Brown,* 407 N.W.2d at 599. For the same reasons articulated above, Muller has shown that he was subjected to termination and that Fernholz's composition of a job description, complete with tasks that no employee has corroborated as being "essential" to the job of plant foreperson, and the events following his injury, namely, the allegations of sexual harassment and alcohol and drug abuse on the job, all reveal material fact questions that Hotsy's employment decision was more likely than not ... based on an impermissible consideration. *See Miller,* 497 N.W.2d at 840.

In summary, primarily for the same reasons Muller generated material fact questions that Fernholz and Hotsy perceived him as "disabled" within the meaning of the ADA,

Muller has created material fact questions that Fernholz considered him "disabled" within the meaning of Iowa Code Ch. 216. Muller has generated a genuine issue of material fact that Fernholz believed his injuries substantially limited his ability to work. In addition, Muller raises a genuine issue of material fact that Fernholz considered Muller as being disqualified from a wide range of other available jobs. Thus, the court denies Hotsy's motion for summary judgment on Muller's claim of disability discrimination under Iowa Code Ch. 216. The court now turns to the consideration of Hotsy's motion for summary judgment on Muller's claim under Section 504 of the Rehabilitation Act of 1973.

### C. Muller's Rehabilitation Act Claim

■ In his complaint, Muller alleges he "was at all times an otherwise qualified individual with handicaps within the meaning of Section 504 of the Rehabilitation Act of 1973." *See* 29 U.S.C. § 794. Muller further claims that Hotsy failed to assess the essential functions of the job of plant foreperson and to determine whether Muller could perform these functions with or without reasonable accommodation. Hotsy contends, however, that because it does not receive federal assistance within the meaning of the Rehabilitation Act, it is not subject to the Act. Although Hotsy admits it has a GSA contract with the United States Government, Hotsy asserts that merely having a government contract does not necessarily mean that it is receiving "federal financial assistance" to bring Hotsy within the purview of the Act.

Section 504 of the Rehabilitation Act addresses the issue of nondiscrimination under federal grants and programs. Specifically, this section provides as follows:

> No otherwise qualified individual with a disability in the United States ... shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. ...

29 U.S.C. § 794(a) (1995). The Act defines "program or activity" as all of the operations of

> (A) an entire operation, partnership or other private organization, or an entire sole proprietorship—
>
> (I) if assistance is extended to such corporation, partnership, or other private organization, or sole proprietorship as a whole; or
>
> (ii) which is principally engaged in the business of providing education, health care, housing, social services, or parks and recreation; or
>
> (B) the entire plant or other comparable, geographically separate facility to which Federal financial assistance is extended, in the case of any other corporation, partnership, private organization, or sole proprietorship.... any part of which is extended Federal financial assistance.

29 U.S.C. § 794(b)(3)(A) & (B).

■ A corporation receives "financial assistance" within the meaning of Section 504 of the Act when it receives a subsidy. *DeVargas v. Mason & Hanger–Silas Mason Co.*, 911 F.2d 1377, 1382 (10th Cir.1990), *cert. denied*, 498 U.S. 1074, 111 S.Ct. 799, 112 L.Ed.2d 860 (1991); *Vacco v. Mid Hudson Medical Group*, 877 F.Supp. 143, 149–50 (S.D.N.Y.1995) (federal financial assistance is a transfer of government funds by way of a subsidy, or a sale of government assets at reduced consideration). In *DeVargas*, the Tenth Circuit determined that Congress did not intend to subsidize the operations of a corporation which provided security inspectors at the Department of Energy's research laboratory; thus, the corporation had not been receiving federal financial assistance within the meaning of the Rehabilitation Act. *Id.* In that instance, the government had conducted a study which showed that the government would save money by contracting out guard services. *Id.* In addition, other courts have held that if the government's intention is only to compensate a corporation for goods and services received, then there is no subsidy for purposes of Section 504. *See Jacobson v. Delta Airlines*, 742 F.2d 1202, 1210 (9th Cir.1984) (payments constitute federal financial assistance if they

include a subsidy, but not if they are merely compensatory), *cert. dismissed,* 471 U.S. 1062, 105 S.Ct. 2129, 85 L.Ed.2d 493 (1985); *Hamilton v. Illinois Cent. R.R. Co.,* 894 F.Supp. 1014, 1020–21 (S.D.Miss.1995) (where purpose of government was merely to compensate for services, there can be no federal financial assistance under Section 504); *Mass v. Martin Marietta Corp.,* 805 F.Supp. 1530, 1542 (D.Colo.1992) (payment pursuant to a contract does not‘necessarily imply federal financial assistance); *see also* 45 C.F.R. § 84.3(h) (procurement contracts do not constitute federal financial assistance); 32 C.F.R. § 56.3(b) (same); 14 C.F.R. § 1251.102(f) (same). Although in *United States v. Baylor Univ. Medical Ctr.,* 736 F.2d 1039 (5th Cir.1984), *cert. denied,* 469 U.S. 1189, 105 S.Ct. 958, 83 L.Ed.2d 964 (1985), the Fifth Circuit found that the Rehabilitation Act is applicable to personal services provided by physicians or hospitals that receive Medicare and Medicaid payments, the district court in *Mass* distinguished the receipt of Medicare and Medicaid payments from the receipt of goods or services pursuant to a contract. *Mass,* 805 F.Supp. at 1542. The court found that "when the government provides Medicare and Medicaid payments to a hospital, it receives no goods or services in return. In contrast, the payments made by the government to defendant [corporation] are part of a contract under which the government receives goods and services." *Id.*

Hotsy's GSA contract with the United States government enabled government agencies to purchase needed supplies and equipment from a GSA catalog, in which Hotsy advertised its guaranteed lowest prices for various pieces of equipment. Under this contractual arrangement, the government received the benefit of obtaining lower prices for equipment than they would pay to a distributor. Thus, the undisputed facts reveal that Hotsy is providing a service to the government, for which the government compensates Hotsy. Because the intention of the government is to compensate Hotsy

for its goods and services, and not to subsidize Hotsy, Hotsy's operations are not "programs or activities that receive [f]ederal financial assistance." *See* 29 U.S.C. § 794. Therefore, the court finds that Hotsy is entitled to judgment as a matter of law on Muller's claim under Section 504 of the Rehabilitation Act of 1973.

Having determined that Hotsy is entitled to judgment as a matter of law on Muller's claim under the Rehabilitation Act, the court proceeds to consider Muller's claim under the Family and Medical Leave Act ("FMLA").

### D. Muller's Claim Under The FMLA

■ In support of its motion for summary judgment, Hotsy admitted that it is an "employer" under the FMLA.[11] Because it is an employer under the FMLA, this Act requires Hotsy to provide "eligible employees" twelve weeks of family medical leave. Hotsy argues, however, that Muller was not an "eligible employee" under the terms of the FMLA because he is an "employee of an employer who is employed at a worksite at which such employer employs less than fifty employees if the total number of employees employed by that employer within seventy-five miles of that worksite is less than fifty." 29 U.S.C. § 2611(2)(B). At the time of Muller's discharge, Hotsy employed eleven employees at the Estherville site and twenty-one employees at the Humboldt site, the only Hotsy site within seventy-five miles of the Estherville site. Thus, the undisputed facts reveal that Muller is not an eligible employee because he worked at the Estherville site where Hotsy employed less than fifty employees, and the total number of employees employed by Hotsy within seventy-five miles of the Estherville site was thirty-two, or less than fifty.

Muller does not dispute these facts, but instead argues that Hotsy waived the right to prove that it is not an "employer" under the terms of the FMLA because it already ad-

---

11. Hotsy admitted it is an employer under the FMLA because it is "engaged in commerce or in industry or activity affecting commerce" and employs "50 or more employees for each working day during each of the 20 or more calendar work weeks in the current or preceding calendar year." *See* 29 U.S.C. § 2611(4)(A)(i).

mitted it was an employer under this Act.[12] However, Hotsy is not claiming it is not an "employer" under the FMLA; it is asserting that Muller is not an "eligible employee" under the FMLA. Nothing in the summary judgment record indicates that Hotsy has waived its right to assert this argument. Thus, the court finds that Hotsy has not waived its right to claim that Muller is not an eligible employee. Furthermore, due to the number of employees at the Estherville and Humboldt plants, Muller is not an "eligible employee" under the FMLA. Therefore, the court finds that Hotsy is entitled to summary judgment on Muller's claim under the FMLA. Before considering Muller's pendent state law claims, the court will consider Hotsy's motion for summary judgment regarding Muller's ERISA claim.

### E. *Muller's ERISA Claim*

In his complaint, Muller states a cause of action arising under ERISA in that his claim relates to benefits under an employee welfare plan. Specifically, Muller alleges that he was entitled to "long term disability benefits as a result of his injuries suffered on June 10, 1993" and that after Hotsy terminated him, it refused to continue to pay long term disability because Muller was no longer an employee. Hotsy argues summary judgment is appropriate on this claim because Hotsy never denied a claim for long term disability payments, considering that Muller never made a request for benefits under the terms of the policy. In addition, Hotsy argues that even if Muller had made a request for benefits, he was not eligible for long term disability payments at the time of his discharge because under the express terms of the Summary Plan Description regarding Group Term Disability Insurance, Muller's insurance ended automatically on the date his employment terminated. In response, Muller argues that Hotsy has waived the defense that Muller failed to exhaust his administrative remedies in neglecting to file

a claim for benefits because in its answer, Hotsy submitted a general denial to Muller's allegations involving his ERISA claim. In addition, Muller claims that he never received a copy of the Summary Plan Description; therefore, he was not aware of the procedures for filing a claim for benefits under Hotsy's insurance plan. Lastly, in its resistance brief, Muller makes the general contention that Hotsy's brief implies that it "avoid[s] payment of disability payments by discharging its employees." (Muller's Resistance Brief, p. 14).

In response to Muller's argument, Hotsy maintains that in order to survive summary judgment, Muller must prove unlawful ERISA discrimination either by direct evidence or circumstantial evidence. Hotsy argues that there is absolutely no evidence in the summary judgment record indicating that interference with ERISA rights was a motivating factor in Muller's termination. Therefore, Hotsy contends that it is entitled to summary judgment on this claim.

■ Under Section 510 of ERISA, it is unlawful "for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan ... or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan...." 29 U.S.C. § 1140. Unlawful discrimination under ERISA may be shown either by direct proof or by circumstantial evidence under the standard established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, and restated in *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. at 253–54, 101 S.Ct. at 1093–95. *See Carter v. City of Miami*, 870 F.2d 578 (11th Cir.1989); *Nelson v. J.C. Penney Co.*, 858 F.Supp. 914, 923 (N.D.Iowa 1994), *aff'd in*

---

12. On September 7, 1995, Chief Magistrate Judge John A. Jarvey issued an Order Regarding Muller's Motion to Compel, which required that Hotsy either produce the information Muller requested in discovery, namely, a complete Iowa payroll and list of all Iowa employees, admit it is an employer within the meaning of the ADA, or reserve its rights "to contend that the Humboldt plant should not be included in determining whether it is an employer while conceding that if it can be considered the defendant would thereby become an "employer" within the meaning of the Act." Hotsy chose to admit it was an employer under the ADA and the FMLA.

*part and vacated on other grounds,* 75 F.3d 343 (8th Cir.1996).

▇▇▇ Where a plaintiff alleges an ERISA violation pursuant to 29 U.S.C. § 1140, he must establish a *prima facie* case by showing that (1) he was protected under ERISA; (2) he was qualified for the position; and (3) he was discharged under circumstances that give rise to an inference of discrimination. *Little v. Cox's Supermarkets,* 71 F.3d 637, 642 (7th Cir.1995); *Barbour v. Dynamics Research Corp.,* 63 F.3d 32, 38 (1st Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 914, 133 L.Ed.2d 845 (1996); *Henson v. Liggett Group, Inc.,* 61 F.3d 270, 277 (4th Cir.1995); *Ritter v. Hughes Aircraft Co.,* 58 F.3d 454, 457 (9th Cir.1995); *Clark v. Coats & Clark, Inc.,* 990 F.2d 1217, 1223 (11th Cir.1993) (quoting *Turner v. Schering–Plough Corp.,* 901 F.2d 335, 347 (3d Cir. 1990)); *cf. Adams v. LTV Steel Mining Co.,* 936 F.2d 368, 370 (8th Cir.1991) (to establish *prima facie* case of ERISA discrimination, plaintiff must show that prohibited conduct was taken for the purpose of interfering with the attainment of any right to which employees may become entitled), *cert. denied,* 502 U.S. 1073, 112 S.Ct. 968, 117 L.Ed.2d 134 (1992). To satisfy this third element, a plaintiff must introduce evidence that interference with ERISA rights was a motivating factor in his discharge. *See Turner,* 901 F.2d at 348. Furthermore, this introduction of evidence requires more than a showing that the plaintiff was deprived of the opportunity to accrue more benefits. *Clark,* 990 F.2d at 1224. Rather, a plaintiff must prove that his discharge resulted in a substantial savings to a defendant in terms of benefit expenses. *See Nelson,* 858 F.Supp. at 923 (citing *Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1115 (2d Cir.1988)).

▇▇▇ Here, even assuming that Muller could meet the first two elements of his *prima facie* case of proving unlawful ERISA discrimination, the only evidence Muller offers to prove that Hotsy interfered with his ERISA rights is his allegation that the "implication as acknowledged by Hotsy's brief that they avoid payment of disability payments by discharging employees." Mere conclusory allegations will not suffice to withstand a motion for summary judgment. *See Tonelli v. United States,* 60 F.3d 492, 496 (8th Cir.1995); *Murr Plumbing, Inc. v. Scherer Bros. Fin. Serv. Co.,* 48 F.3d 1066, 1071 (8th Cir.1995); *Krenik v. County of Le Sueur,* 47 F.3d 953, 960 (8th Cir.1995). Thus, even assuming that Muller could prove he was a participant under the Plan, considering that he denies he was a participant in an attempt to prove a lack of knowledge of the proper procedure for making a claim for benefits, Muller has introduced no evidence that Hotsy's alleged interference with his ERISA rights was the motivating factor for his termination. Therefore, the court grants Hotsy's motion for summary judgment on Muller's ERISA claim.

## F. *Muller's Wrongful Discharge Claim*

▇▇▇ In addition to alleging an ERISA claim, Muller argues that at the time of his discharge, Muller was eligible for short-term disability benefits, and that contrary to public policy and the terms of ERISA, Hotsy discharged Muller with the purpose of frustrating his claims for disability. Hotsy asserts that an alleged violation of ERISA is not an appropriate basis for a public policy exception.

In *Thompto v. Coborn's, Inc.,* 871 F.Supp. 1097 (N.D.Iowa 1994), this court recognized that "the legislature may explicitly prohibit the discharge of an employee who acts in accordance with a statutory right or duty." *Id.* at 1113. In addition, the court found that the common-law action for wrongful discharge exists "for the purpose of protecting an employee against retaliation when a statutory right is conferred but no statutory remedy is provided...." *Id.* at 1121; *see also Borschel v. City of Perry,* 512 N.W.2d 565, 567–68 (Iowa 1994) (wrongful discharge action will not stand if the statute supplying the policy also provides for a remedy, but will stand where the statute does not provide a remedy).

Not only does ERISA clearly create a statutory cause of action and provide for a remedy therein pursuant to 29 U.S.C. §§ 1132 & 1140, Muller has alleged a cause of action under this statute. Section 1140

provides for a cause of action based on the interference with ERISA rights, stating that

[i]t shall be unlawful for any person to discharge, ... or to discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employment benefit plan ... or for the purpose of interfering with the attainment of any right to which the participant may become entitled to under the plan.... The provisions of section 1132 of this title shall be applicable to the enforcement of this section.

29 U.S.C. § 1140. Section 1132 allows a participant or beneficiary to bring a civil action for relief or to recover benefits due to him. *See* 29 U.S.C. § 1132(g)(1). Thus, because the ERISA statute provides Muller with a remedy, his claim that he was wrongfully discharged in violation of public policy is not allowed under Iowa law. Thus, the court grants Hotsy's motion for summary judgment on this issue.

### G. Muller's Claim Under Iowa Code Ch. 91B

■ Lastly, Muller claims that Hotsy was required to provide a copy of his personnel file to him upon request pursuant to Iowa Code Chapter 91B. Iowa Code Chapter 91B provides as follows:

[a]n employee, as defined in section 91A.2, shall have access to and shall be permitted to obtain a copy of the employee's personnel file maintained by the employee's employer, as defined in section 91A.2, including but not limited to performance evaluations, disciplinary records, and other information concerning employer-employee relations.

Iowa Code Chapter 91B. Chapter 91A.2 provides the following definitions of "employee" and "employer":

'Employee' means a natural person who is employed in this state by an employer ...

'Employer' means a person ... who in this state employs for wages a natural person....

Iowa Code Chapter 91A.2(3) & (4). Hotsy admits it did not provide a copy of Muller's personnel file when he initially requested it;

however, Hotsy argues that it did not violate Iowa Code Ch. 91B because Muller was not an employee at the time he requested a copy of his personnel file. Rather, Muller had already been terminated at the time he made this request. Thus, Muller is not an employee under Iowa Code Ch. 91A.2(3), and Hotsy is not liable under Iowa Code Ch. 91B.

■ The best means for determining whom the Iowa legislature intended to include as an "employee" under Iowa Code Ch. 91A.2(3) is an examination of the statute itself. "The task of resolving the dispute over the meaning of [a statute] begins where all such inquiries must begin: with the language of the statute itself." *United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989); *Chevron U.S.A. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984); *United States ex rel. Harlan v. Bacon,* 21 F.3d 209, 210 (8th Cir.1994) ("When construing a statute, we are obliged to look first to the plain meaning of the words employed by the legislature ...") (citing *Chevron,* 467 U.S. at 842–43, 104 S.Ct. at 2781–82); *United States v. Manthei,* 979 F.2d 124, 126 (8th Cir.1992) ("When interpreting statutory language, the court must first look to the plain meaning of the language") (citing *North Dakota v. United States,* 460 U.S. 300, 312–13, 103 S.Ct. 1095, 1102–03, 75 L.Ed.2d 77 (1983)). The Supreme Court describes this rule as the "one, cardinal canon before all others." *Connecticut Nat'l Bank v. Germain,* 503 U.S. 249, 253, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992). Thus, "courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Id.* (citing *Ron Pair,* 489 U.S. at 241–42, 109 S.Ct. at 1030–31; *United States v. Goldenberg,* 168 U.S. 95, 102–03, 18 S.Ct. 3, 4, 42 L.Ed. 394 (1897); *Oneale v. Thornton,* 6 Cranch 53, 68, 3 L.Ed. 150 (1810)).

■ When the language of the statute is plain, the inquiry also ends with the language of the statute, for in such instances "the sole function of the courts is to enforce [the statute] according to its terms." *Ron Pair,* 489 U.S. at 241, 109 S.Ct. at 1030 (quoting *Caminetti v. United States,* 242 U.S.

470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917)); *Melahn v. Pennock Ins., Inc.*, 965 F.2d 1497, 1502 (8th Cir.1992) (plain meaning of a statute governs over ambiguous legislative history, citing *Ron Pair Enterprises* ). The plain meaning of a statute is decisive, "except in the rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters." *Ron Pair*, 489 U.S. at 242, 109 S.Ct. at 1031 (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982)); *INS v. Cardoza–Fonseca*, 480 U.S. 421, 452, 107 S.Ct. 1207, 1223, 94 L.Ed.2d 434 (1987) (Scalia, J., concurring in judgment) (ordinary meaning governs unless implementing it would be "patent absurdity").

 However, "[p]lain meaning, like beauty, is sometimes in the eye of the beholder," *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 737, 105 S.Ct. 1598, 1603, 84 L.Ed.2d 643 (1985). Thus, the court must not reach its decision about the meaning of a statute

> by a strict construction of the words of the Act, nor by application of artificial canons of construction. On the contrary, we are to read the statutory language in its ordinary and natural sense, and if doubts remain, resolve them in the light, not only of the policy intended to be served by the enactment, but, as well, by all other available aids to construction. But it is not our function to engraft on a statute additions which we think the legislature logically might or should have made.

*Bacon*, 21 F.3d at 210 (quoting *United States v. Cooper, Inc.*, 312 U.S. 600, 605, 61 S.Ct. 742, 744, 85 L.Ed. 1071 (1941)). Thus, the court must assume that the words of a statute, construed in their ordinary meaning, accurately express the legislative purpose, and the court should decline to frustrate the plain meaning of the words chosen by the legislature. *United States v. Talley*, 16 F.3d 972, 976 (8th Cir.1994).

 Here, according to the plain language of Iowa Code Ch. 91A.2(3), Muller is not an "employee" for purposes of Iowa Code 91B because at the time he requested his personnel file, he was no longer "employed in this state by an employer." *See* Iowa Code 91A.2(3). Thus, the court finds that Hotsy did not violate Iowa Code Ch. 91B by refusing to provide a copy of the personnel file to him when he initially requested it. In addition, because Hotsy ultimately provided Muller a copy of the file through discovery in this litigation and Muller has suffered no damages as a result of Hotsy's initial denial of Muller's request, the court concludes that this issue is moot. Therefore, the court finds that Hotsy is entitled to summary judgment on Muller's claim pursuant to Iowa Code Ch. 91B.

## V. CONCLUSION

Based on its review of the summary judgment record as a whole, the court concludes that Muller has generated material fact questions regarding his ADA claim. Specifically, there are genuine issues of material fact as to (1) whether Fernholz regarded Muller as having an impairment that substantially limited his ability to work; (2) whether Muller is a qualified individual under the ADA; and (3) whether Muller has established a *prima facie* case under the ADA. Thus, the court denies Hotsy's motion for summary judgment on Muller's ADA claim.

Likewise, the court finds that Muller has generated material fact questions regarding his disability claim under the Iowa Civil Rights Act. The record reveals genuine issues of material fact as to (1) whether Muller had a protected disability under the ICRA; (2) whether Muller is a qualified individual under the ICRA; and (3) whether Muller has established a *prima facie* case under the ICRA. Therefore, the court denies Hotsy's motion for summary judgment on Muller's claim under Iowa Code Ch. 216.

Regarding Muller's claim pursuant to Section 504 of the Rehabilitation Act of 1973, the court finds that Hotsy's GSA contract with the United States government did not constitute "federal financial assistance" to bring Hotsy within the parameters of the Rehabilitation Act. Because Hotsy is not subject to this Act, the court grants Hotsy's motion for summary judgment on Muller's claim under the Rehabilitation Act of 1973.

In addition, the court concludes that Hotsy did not waive its right to assert Muller is not an "eligible employee" as defined in the Family and Medical Leave Act. Because the court concludes that the undisputed facts reveal that Muller is not an eligible employee under the terms of the FMLA, the court grants Hotsy's motion for summary judgment on Muller's FMLA claim as well.

The court also concludes that because Muller has introduced no evidence to indicate that Hotsy's alleged interference with its ERISA rights was the motivating factor behind his termination, Hotsy is entitled to judgment as a matter of law on Muller's ERISA claim. In addition, the court finds that because the ERISA statute provides Muller with a statutory remedy, an alleged violation of ERISA is an inappropriate basis for Muller's claim that he was wrongfully discharged in violation of public policy. Therefore, the court grants Hotsy's motion for summary judgment on Muller's pendent state law wrongful discharge claim.

Lastly, because Muller was not an "employee" as defined in Iowa Code Chapter 91A.2(3), Hotsy did not violate Iowa Code Chapter 91B by initially refusing to provide Muller a copy of his personnel file upon his request. Furthermore, the court concludes that this issue is moot because Hotsy eventually provided Muller with a copy of this file through discovery in this litigation. Therefore, Muller suffered no damages from Hotsy's initial denial of Muller's request for this file. For these reasons, the court grants Hotsy's motion for summary judgment on Muller's claim pursuant to Iowa Code Ch. 91B.

**IT IS SO ORDERED.**